SEITZ, Justice, for the Majority:
I. INTRODUCTION
This is the second appeal by SIGA Technologies, Inc. (“SIGA”) ■ from a Court of Chancery judgment awarding PharmAth-ene, Inc. (“PharmAthene”) damages stemming from failed merger and license negotiations between the parties. In the first appeal, this Court upheld the Court of Chancery’s finding that SIGA in bad faith breached its contractual obligation to negotiate a license agreement consistent with the parties’ license agreement term sheet, known throughout this litigation as ■ the “LATS.” This Court also held that where parties have agreed to negotiate in good faith, and would have reached an agreement but for the defendant’s bad faith conduct during the negotiations, the plañir tiff can recover contract expectation damages, so long as the plaintiff can prove damages with reasonable certainty. Because the Court of Chancery ruled out expectation damages in its first decision, this Court remanded the case to reconsider an award of damages to SIGA in a decision we will call “SIGA I.”[1]
The Court of Chancery did as instructed and reevaluated the evidence, including evidence of expectation damages. Although the court previously found that lump-sum expectation damages were too speculative to recover, the Court of Chancery held on remand that PharmAthene met its burden of proving with reasonable certainty expectation damages and awarded PharmAth-ene $113 million.[2] The parties once again appealed to this Court.
•SIGA raises essentially two claims of error in the current appeal: first, the Court of Chancery was not free to reconsider its prior holding that lump-sum expectation damages, were too speculative; and, second, if reconsideration was permitted, the expectation damages awarded following remand were too speculative. After careful consideration of SIGA’s arguments, we find that the law of the case doctrine did not preclude the Court of Chancery from reconsidering its earlier determination that lump-sum expectation damages were too speculative. In SIGA 1, this Court' clarified that expectation damages were available, instructed the Court of Chancery to revisit its damages award, directed the trial court to reevaluate the helpfulness of expert testimony, and permitted the court to make any order in- further progress of the case not inconsistent with the SIGA I decision. The Court of .-Chancery followed the law of the *1111 case by complying with the mandate in SIGA I.
We also find that the court did not abuse its discretion when it awarded PharmAth-ene lump-sum expectation damage's, and its factual findings supporting its new damages determination were not clearly erroneous. The Court of Chancery considered anew all issues relevant to the remedy, including the uncertainty caused by the wrongdoer’s breach. When a party breaches a contract, that party often creates a course of events that is different from those that would have transpired absent the breach. The breaching party cannot avoid responsibility for making the other party whole simply by arguing that expectation damages based on lost profits are speculative because they come from an uncertain world created by the wrongdoer. Rather, when a contract is breached, expectation damages can be established as long as the plaintiff can prove the fact of damages with reasonable certainty. The amount of damages can be an estimate.[3] When awarding lump-sum expectation damages for breach of a Type II contract, the Court of Chancery correctly took into account all the circumstances of the breach, including the wrongdoer’s willfulness,[4] especially when the wrongdoer caused uncertainty about the economic terms of the transaction by its failure to negotiate in good faith.[5] Accordingly, we affirm the judgment of the Court of Chancery.
II. FACTUAL BACKGROUND[6]
A. SIGA’s Development Of ST-246
In 2004, SIGA acquired technology for ST-246, an antiviral drug for the treatment of smallpox. At that time, the viability,. potential uses, safety, and efficacy of the drug, as well as the likelihood of SIGA obtaining regulatory' approval or making sales to the government, were, as is typical in this industry, uncertain,
By late 2005, SIGA was running out of money, fits largest shareholder, MacAn-drews & Forbes, refused to invest additional funds, and the NASDAQ threatened to de-list its shares. -SIGA estimated that it needed an additional $16 million to complete development of the drug. On top of its -.financial problems, SIGA .was having trouble developing ST-246 because it had no experience or .employee expertise bringing a drug to market. ■ - .
B. SIGA And PharmAthene Negotiate A Business Collaboration
In dire straits, SIGA began discussing a possible collaboration with PharmAthene. This was not their first attempt to work together. - PharmAthene had previously *1112 backed out of merger negotiations between the parties in late 2003. Nevertheless, Thomas Konatich, SIGA’s Chief Financial Officer, contacted Eric Richman, PharmAthene’s Vice President of Business Development and Strategies, to begin discussions. According to Richman’s contemporaneous notes, due to the prior failed attempt at a merger and to SIGA’s need for a fast cash infusion, SIGA insisted on framing a license agreement before discussing a potential merger.
Both companies put together teams to negotiate the potential business collaboration. On SIGA’s side, in addition to CFO Konatich; the key participants included the Chairman of SIGA’s board, Donald Drap-kin, who also served as the Vice Chairman of SIGA’s biggest stockholder, MacAn-drews & Forbes; SIGA’s Chief Scientific Officer, Dennis Hruby, who kept SIGA’s senior management apprised of ST-246’s scientific developments; and then-board member and current Chief Executive Officer, Eric Rose. SIGA’S financial controller, Ayelet Dugary, prepared financial projections that informed the negotiations. Additionally, several in-house lawyers from MacAndrews & Forbes took an active role in negotiating with PharmAthene on SIGA’s behalf, including Michael Borofsky who was involved in negotiating the terms of the LATS; and Steven Fasman, who worked with SIGA personnel to prepare a valuation of ST-246, and who was involved in discussions with PharmAthene after SIGA experienced positive developments and backed out of the merger and the LATS negotiations. SIGA also hired attorney'Nicholas Coch to represent it in communications with PharmAthene’s attorney right before SIGA breached its obligation .to negotiate a license agreement according to the LATS.
PharmAthene’s team, assembled by Richman, included CEO David Wright; CFO Ronald Kaiser; and board member Elizabeth Czerepark; as well as attorney Jeffrey Baumel. PharmAthene also later hired attorney Elliot Olstein who communicated with SIGA’s attorney Coch in the time leading up to SIGA’s breach.
1. SIGA And PharmAthene Negotiate And Sign The LATS
Konatich and Richman led the negotiations over the license agreement on behalf of their companies. The Court oí Chancery found that at the end of 2005, the parties conservatively valued ST-246’s market potential at around $1 billion to $1.26 billión.[7] The parties reflected their negotiations in the specific terms of the LATS, with the last revisions dated January 26, 2006. This final version of the LATS was titled “SIGA/PharmAthene Partnership” and the footer of the document read: “Non Binding Terms.”[8]' The objective read: “To establish a partnership to further develop & commercialize [ST-246] for the treatment of Smallpox and orthopox related infections and to develop other orthopox vims therapeutics.”[9] The LATS provided that- SIGA would grant PharmAthene a worldwide, exclusive license to use, develop, sell, and sublicense ST-246 and related products. The LATS also contemplated a joint research and development committee and allocated certain roles on the committee to PharmAthene and SIGA. PharmAthene would also fund research at SIGA based on a defined research and development plan and budget.
The LATS included a number of economic terms. PharmAthene had to pay a *1113 total “License Fee” of $6 million, consisting of (1) a $2 million upfront ,cash payment; (2) a $2.5 million deferred license fee to be paid 12 months after the execution of a license agreement upon the occurrence of certain events; and (3) a $1.5 million payment to be made after SIGA obtained over $15 million in financing. The LATS also required PharmAthene to pay up to an additional $10 million for SIGA’s achievement of certain -milestones such as meeting specific sales targets, and obtaining necessary regulatory approvals. Additionally, PharmAthene was required to make incremental annual, royalty payments on net sales of “Patented Products” on a sliding percentage scale of between 8% and 12%, depending on. the amount of yearly sales. SIGA was also “entitled to receive 50% of any amounts by which [the] net margin exceeded] 20% on sales to the [U.S.] Federal Government.”[10] After negotiating the LATS, the parties turned their focus to. merger negotiations.
2. SIGA And PharmAthene Enter Into A Bridge Loan Agreement And A Merger Agreement
Due to SIGA’s precarious financial position, PharmAthene agreed to provide SIGA with bridge financing for continued development of ST-246 while the parties negotiated a merger. On March 20, 2006, the parties entered into a Bridge Loan Agreement whereby PharmAthene loaned SIGA $3 million. Section 2.3(a) of the Bridge Loan Agreement bound the parties to negotiate in good faith a license agreement in accordance with the terms of the LATS if the merger was terminated or not executed, and imposed a 90-day exclusivity period.[11]
After executing the Bridge Loan Agreement, SIGA and PharmAthene continued to negotiate the merger. In connection with the merger discussions, PharmAthene created a financial model in February 2006 based on SIGA’s evaluation of ST-246’s market potential (the “PharmAthene Model”). On June 8, -the parties signed a Merger Agreement. Section 12.3 of the Merger Agreement imposed a similar obligation on the parties to negotiate in good faith a license agreement in accordance with the LATS if the merger was terminated.[12] The Merger Agreement had a drop-dead date of September 30. The parties attached the LATS as an exhibit to the Bridge Loan Agreement and the Merger Agreement.
*1114 C. ' ST-246’s Prospects Improve As The Drug Hits Development Milestones And SIGA Acquires Funding
After the parties signed the Merger Agreement, SIGA experienced several positive developments, the most important of which related to developments suggesting that ST-246 had bright prospects. First, on-June 9, SIGA’s Chief Scientific Officer, Hruby, received news of a. $5.4 million award for ST-246 from the National Institute of Allergy and Infectious Disease.[13] Hruby informed Konatich of the grant in an email, to which Konatich responded: “[I]t is a damn shame we had to merge.”[14] Hruby stated in his response: “With the 5.4M grant being activated, the 10.9M BAA award on its way, an 8M grant pending along with a couple of appropriations— we could have gone all the way ourselves. Instead we got sold into slave labor and if anything the [PharmAthene] gang will drag us down.”[15] Next, on July 13, SIGA announced that, “its lead smallpox drug candidate, [ST-246], has successfully completed the first planned human clinical safety trial.”[16] Then, on September 13, Hruby called Richman to tell him that personnel at the Centers for Disease Control and Prevention, where tests of ST-246 were conducted, “are beside themselves— never saw anything like it.”[17]
A few months later, on September 27, Hruby emailed a number of high-level SIGA officials (including CEO, Donald Drapkin, and board member Adnan Mjalli) to 'inform them of the company’s' recent accomplishments. In this email, Hruby lauded the success of'recent trials of ST-246 as “excellent” and having “no adverse effects.”[18] He also noted that he presented to the Department of Homeland Security and the Department of Defense (“DoD”) the week before, and that the agencies were “very ‘impressed’ and both indicated acquisitions in the future.”[19] He further explained that “[the Department of Homeland Security] is developing an implementation plan that will be disclosed Jan. 1 that should spell out the timing and size of the acquisition. Of note, both groups also indicated an interest in acquiring our HFV antivirals in development.”[20]' - ■ Notably, Hruby also announced the following:
[W]e just received today notice of award on a $16.5M contract'from the [National Institutes of Health] to fund all ST-246 development activities up to and through the NDA filing. Bottom line is the product’s entire development is supported, we have all the necessary partnerships and advocates in place, and we have the team' in place to see it through.[21]
After pointing out all of SIGA’s recent successes, Hruby concluded in his email:
I have grave concerns about the merger as it is currently going forward-in that it appears that the merged company will not be [Small Business Innovation Research] compliant. In that case, we would have- to shut down $30M in current grants and contracts and damage *1115 all the positive relationships we have ■developed to date.[22] -
When Hruby testified at trial, he stated that his representation that $30 million would be lost “might have been an exaggeration.” [23]
D. SIGA Terminates The Merger Agreement And Proposes A LLC Agreement In Place Of A Licensing Agreement In Accordance With The Terms Of The LATS
Meanwhilé, the Merger Agreement’s drop-dead date of September 30 approached, but the SEC had not yet approved SIGA’s draft of the related proxy statement. On October 3, Fasman emailed Hruby stating: “Here is the decision to be reached: Should SIGÁ continue with its merger plans or should it try to go it alone?”[24] SIGA’s board met the next day. According to the board minutes, Chairman Drapkin discussed the planned merger and whether SIGA should exercise its right to terminate the merger given that it did not close before September 30, or whether SIGA should grant PharmAth-ene an extension. Hruby gave a presentation about SIGA’s scientific results and Konatich presented on SIGA’s financial status. At this meeting, the SIGA board resolved to terminate the Merger Agreement.
Two weeks later, SIGA publicly announced that the results of a primate trial showed that ST-246 provided 100% protection against smallpox. On October 18, SIGA’s Controller, Dugary, emailed Kona-tich and SIGA’s legal representatives a financial analysis concluding that total past and future development costs equaled $39.66 million, and that a $40 million upfront license fee would support a 50-50 split of ST-246’s profits.[25] On October 19, SIGA announced a $9 million private placement whereby it sold two million shares of its-stock at a price three times greater than SIGA’s 2005 share price.
On October 26, PharmAthene attorney Elliot Olstein emailed SIGA attorney Nicholas Coch, advising Coch that PharmAth-ene was prepared to sign its proposed draft of the license agreement.[26] Coch responded that the nature of the negotiations necessitated a-meeting.[27]
On November 6, the parties met for the first time since SIGA’s termination of the merger agreement to discuss a license agreement. Richman attended the meeting with PharmAthene attorneys Baumel and Olstein. Konatich and Rose were present on SIGA’s side along with their legal counsel, Coch and attorney Fasman. Fasman spoke to SIGA’s perspective, emphasizing the FATS’s reference to a “partnership” between the parties and the need to revise some of the economic terms of the FATS. He proposed a $40 to $45 million upfront fee and a 50-50 profit split. Olstein insisted that the parties were bound by the LATS but allowed SIGA to put together a formal proposal.
On November 9, SIGA announced that ST-246 demonstrated protection against the monkeypox virus in two primate trials. Then, on November 21, SIGA sent Phar-mAthene a draft LLC Agreement that departed . drastically from the terms of the LATS in a way that strongly favored SIGA.
*1116 E. SIGA’s Internal Valuation Of ST-246 Ranged Between $3 Billion And $5.6 Billion Before SIGA’s Breach
With SIGA’s proposed draft of an LLC agreement in the background, in a series of emails on November 27 and 28, Fasman communicated with SIGA’s senior management — including CFO Konatich, CEO Drapkin, Controller Dugary, and two board mémbers — about ST-246’s valuation.[28] Fasman’s initial email on November 27 criticized the PharmAthene Model, which reflected sales of between $300 million and $700 million per year starting in 2008, calling this projection “clearly erroneous.”[29] Fasman attached a revised revenue projection that he prepared with input from Konatich and Dugary, and proposed that SIGA should advocate to use the assumptions in his projection in' its discussions with PharmAthene.[30] He concluded, “[a]s you will see, all of the individual assumptions are easily justified, 'and the result shows a $3 billion valuation for [ST-246], which makes the financial terms that SIGA proposed in the [LLC Agreement . between SIGA and PharmAthene] draft circulated last week a bargain.”[31] Fasman also noted in this email that “PharmAthene assumes that [ST-246] can ■be sold for $100/treatment in the U.S. and $150/treatment abroad, prices that appear to us to be excessive.”[32] .
A comparison of the parties’ assumption attached to Fasman’s, email shows that ■SIGA assumed a price of $75 per course of treatment in the U.S. and $100 abroad (with a smaller net margin abroad due to, greater marketing expenses).[33] The comparison table revealed additional differences between the parties’ assumptions. For example, PharmAthene assumed a 5% contraindication rate[34] for purchase into the Strategic National Stockpile (the “National Stockpile”) whereas SIGA’s table stated that ST-246 can be “therapeutic, prophylactic and adjuvant” and assumed a 20% contraindication rate,[35] which Fasman lowered to 15% in a subsequent email.[36] Also, as to purchase of ST-246 into the ISTational Stockpile, the table reflected that PharmAthene’s view was that, the. “[requirement does not yet exist — dependent on DHHS ‘integration plan’ to be released IQ 07,” and SIGA’s column stated “same.”[37] Additionally, relative-to Phar-mAthene, SIGA assumed higher sales to *1117 the military because it assumed that the size of the military would grow with the population.[38] Finally, the table reflected PharmAthene’s position that sales of ST-246 to the [DoD] may require FDA approval but SIGA’s position was that this was “[n]ot true, or not an obstacle.”[39]
In response to Fasman’s initial email, Dugary suggested that Fasman raise the profit margin used in his projection: “I think the excel.spreadsheet you sent reflected only 33% margin. If you recalculate (see attached revised) with the 75% margin, the net present value increases to $5.1 billion.”[40] Fasman replied to inform the group that he raised the profit margin, but that this resulted in a net present value that was “unreasonably high.”[41] He further explained ;in his email that he made additional adjustments to his original valuation to come up with a net present value of $5.6 billion, calling this “more than sufficient for [SIGA’s] needs.”[42] In another email sent later that day, however, Fas-man noted that “accepting [PharmAth-ene’s] treatment and pricing assumptions, which would lead to a profit margin in excess of 90%, and otherwise using the same cost and discounting assumptions that the prior spreadsheet used, leads to present value well in excess of $2.3 billion.” [43] He concluded that “[b]ecause this valuation is more than sufficient to justify our upfront and milestone payments, wé will begin our discussions with the [Phar-mAthene]-based valuation model.”[44]
On December 4, SIGA attorney Coch sent a letter to PharmAthene attorney Ol-stein. Coch’s. letter stated that SIGA received PharmAthene’s projections for ST-246, reflecting a future: revenue stream of over $2 billion. He further stated that the terms in the proposed LLC agreement were realistic and fair given PharmAth-ene’s valuation, “[a]lthough SIGA believes the actual value of [ST-246] is well in excess of $5 billion (based on projected sales that incorporate more realistic assumptions of the size of the market and up-to-date information concerning the likely uses of [the drug]).”[45] On December 6, Olstein replied that PharmAthene indicated at- a meeting with SIGA that it was “willing to consider” a 50-50 split, and that if SIGA was “married” to having an LLC structure it should incorporate the split into that structure. PharmAthene at no time indicated that it was “prepared to accept a 50-50 proposal or any other proposal in lieu of the binding terms of the [LATS].”[46] On December 12, Coch sent a letter .back to Olstein,, stating that SIGA was prepared to negotiate a definitive agreement “without preconditions,” but that if PharmAthene insisted on the terms of the LATS as binding, then the parties would have “nothing more to talk about.”[47] About a week later, PharmAthene filed a lawsuit in the Court of Chancery.
$ # * t ■
The reason for the end of negotiations has to be underscored to understand the *1118 Court of Chancery’s damages award. SIGA refused to enter into a license agreement in accordance with the LATS not because of any uncertainty about the strongly positive future results for ST-246. Rather, SIGA refused to contract on terms consistent with the LATS because it had come to the belief that ST-246 was worth $3 billion as a conservative matter — due to events that suggested that ST-246’s prospects were much brighter than when the parties agreed to the LATS. As is the case in any business situation, SIGA’s ■ belief was based on its estimate of the future cash flow ST-246 would generate. This reasoned estimate led SIGA first to refuse to merge, and then refuse to negotiate a license agreement on the same material terms as were in the LATS.
III. PROCEDURAL HISTORY
A. The Court of Chancery’s 2011 Decision
In January 2011, the court held án eleven-day trial. In a September 22, 2011 decision (the “2011 Decision”) the Court' of Chancery found, among other things, that (1) SIGA breached its contractual obligation under the Bridge Loan Agreement and the Merger Agreement to negotiate in good faith a definitive license agreement in accordance with the terms of the LATS'; (2) the parties would have agreed to á license agreement that was generally in accordance with the LATS had it not been for SIGA’s bad faith breach;[48] (3) SIGA was liable for damages under the doctrine of promissory estoppel; and (4) the proper remedy under these circumstances was to impose an equitable payment 'stream based on SIGA’s future profits.[49]
The Court of Chancery declined to award lump-sum expectation -damages to PharmAthene, finding that “a specific sum of money representing the present value of the future profits it would have received absent SIGA’s breach is speculative and too uncertain, contingent, and conjectural.” [50] The Court of Chancery additionally declined to order specific performance because- it would impose too great a burden on the trial court to supervise the parties to ensure that they were faithfully carrying out their obligations to negotiate a license agreement in accordance with the terms of the LATS.[51]
On May 31, 2012, the Court of Chancery issued a Final Order and Judgment together with a Letter Opinion. SIGA appealed and PharmAthene cross-appealed to this Court.
B. The 2013 Supreme Court Decision
On May 24, 2013, in SIGA /, this Court affirmed the Court of Chancery’s decision in part, reversed in part, and remanded for further proceedings consistent with its opinion. To begin, SIGA I upheld the Court of Chancery’s decision that SIGA had in bad faith breached its contractual *1119 obligations under the Bridge. Loan Agreement and the Merger Agreement to negotiate a license agreement in accordance with the LATS.[52]
SIGA I then reversed the Court of Chancery’s finding that SIGA was liable on a theory of promissory estoppel. In SIGA, this Court reasoned that “promissory estoppel does not apply ... where a fully integrated, enforceable contract governs the promise at issue,”[53] and in this case, there were two enforceable contracts.[54] SIGA I noted that the Court of Chancery “must look to the contract as a source of remedy on the breach of an obligation to negotiate in good faith.”[55]
Next, SIGA I discussed “Type II preliminary agreements,” which are “preliminary agreements [where the parties] ‘agree on certain major terms, but leave other terms open for further negotiation.’ ”[56] After surveying the law adopted by federal courts,[57] SIGA I held:
[W]here the parties have a Type II preliminary agreement to negotiate in good faith, and the trial judge makes a factual finding, supported by the record, that the parties would have reached art agreement but for the -defendant’s bad faith negotiations, the plaintiff is entitled to recover contract expectation damages.[58]
In a footnote to this holding, SIGA I stated that “[a]n expectation damages award presupposes that the plaintiff can prove damages with reasonable certainty.”[59]
Based on the foregoing, SIGA I remanded to the Court of Chancery with specific instructions to reconsider the damages issue:
Because we had' not previously addressed' whether Delaware recognizes Type II preliminary agreements and permits a plaintiff to recover expectation damages, and because it is unclear to what extent the Vice Chancellor based his damages award upon a promissory estoppel holding rather than upon a contractual theory of liability predicated on a Type II preliminary agreement, we reverse the Vice Chancellor’s damages award and remand the. case for reconsideration of the damages award consistent with this opinion.[60] , .>
*1120 In SIGA I,' this Court also explained when, instructing the Court of Chancery to reconsider the award of attorneys’ fees:
On remand, the Vice Chancellor shall redetermine his damage award in light of this opinion[1] and is free to reevaluate the helpfulness of expert testimony. Therefore, we reverse the award of attorneys’ fees and expenses so that the Vice Chancellor may determine on remand the proper award consistent with this opinion.[61]
Finally, SIGA I noted that it did not reach any of PharmAthene’s claims on cross-appeal, • specifically acknowledging that it did not .determine whether the Court of Chancery erred in declining to award specific performance, among other remedies:
PharmAthene’s claims that it is entitled to (1) an alternative payment stream based on the LATS’s terms, (2) specific performance granting it a license in accordance with the LATS’s terms because the LATS is an enforceable contract, or (3) recover damages under the doctrine of unjust enrichment. All those claims are alternative contentions advanced in the event we do not affirm the Vice Chancellor’s judgment. Because we affirm the Vice' Chancellor’s finding that SIGA is liable for breaching its contractual obligations to negotiate in good faith- in accordance with the LATS’s terms, we do not reach these arguments.
Significant to the present appeal, SIGA I observed that the Court had not determined whether the Court of Chancery erred in declining to award lump-sum ex-' pectation damages because such damages were too speculative, and.instead remanded for reconsideration of the issue:
PharmAthene also contends that the Vice Chancellor erroneously failed to award PharmAthene its lump-sum expectation damages on the basis that they would be too speculative. We do not need, to reach this claim either, because we reverse the Vice Chancellor’s damages award and remand for him to ré-consider.it in light of this opinion.[62]
C. The Court of Chancery’s Decision On Remand
1. The Court Of Chancery Determined That It Was Not Bound By Its Prior Decision Denying Expectation Damages As Too Speculative
On remand, and over SIGA’s objection, PharmAthene moved to reopen the record to introduce post-breach evidence.[63] The Court of Chancery granted PharmAthene’s motion, but noted that it would evaluate any new evidence before admitting it.[64] After a two day evidentiary hearing and post-hearing briefing, on August 8, 2014, the court issued a Memorandum Opinion (“Remand Opinion”), as well as an accompanying Order instructing PharmAthene’s damages expert how to adjust the damages calculation based on the Court of Chancery’s findings (“Remand Order”).[65]
The Vice Chancellor first addressed the threshold questions — whether the trial court may reconsider conclusions made in the 2011 Decision and, if so, whether there was any basis to change his prior holding in those respects. On the first issue, the *1121 Vice Chancellor concluded that “[t]he plain language of the Supreme Court decision indicates that I may reconsider my prior finding that an award of lump-sum expectation damages to PharmAthene would be improper because such a measure of damages is too speculative.”[66] The Vice Chancellor based that conclusion on several aspects of SIGA I. He cited the fact that SIGA I did not reach .PharmAthene’s claim that the Court of Chancery erred in not imposing lump-sum expectation damages for being too speculative. He also pointed to SIGA Ps instruction ■ that the Court of Chancery was free to “reevaluate the helpfulness of expert testimony.”[67]
The Vice Chancellor reasoned that the latter guidance “would be rendered largely superfluous if the rest of [SIGAP ] is read as prohibiting- [the Court of Chancery] from reconsidering whether PharmAthene is entitled to lump-sum expectation damages for SIGA’s bad faith breach.”[68] Thus, the Vice Chancellor concluded that “while I have the authority to reaffirm my previous decision in that regard, I am not required or bound by it to reach the same conclusion I did previously.”[69]
The Vice Chancellor expressed a similar sentiment where he discussed the merits of an award of lump-sum expectation damages. There, he stated that “the Supreme Court explicitly invited me to reconsider my prior holding that an' award of lump-sum expectation damages to PharmAthene for SIGA’s bad faith was unduly speculative.”[70] He then reasoned that a meaningful reconsideration requires' a reexamination of the expert testimony relating to expectation damages. According to the Vice Chancellor, his conclusion was sup,ported by the instruction in SIGA I to redetermine the attorneys’ fees and expenses award, and by SIGA Ps holding that Type II agreements could support an award of expectation damages, noting that the uncertainty as to this point of. law was part of the reason that he had imposed an equitable remedy in the first instance.
The Vice Chancellor then took account of the additional guidance in SIGA I. Specifically, he noted that, in the 2011 Decision, he “awarded PharmAthene a payment stream with terms that were significantly less favorable to it than those set out in the LATS.”[71] And he acknowledged SIGA Ps ruling that “neither party could in good faith propose terms inconsistent with ‘[the LATS] appears to place greater weight on the terms specified in the LATS than I afforded those terms in determining my prior damages award.”[72] From this, he concluded that the Court of Chancery must “[a]t a minimum ... reexamine' the role of the terms of the LATS in crafting any such award.”[73] Relatedly, the Vice Chancellor noted the reality that SIGA ended up expending materially more time and money to develop ST-246 without PharmAth-ene’s participation than the parties contemplated in the LATS:[74] The Vice Chancellor also observed that, after the 2011 Decision, SIGA secured a lucrative ■U.S, government contract to sell ST-246 to the' Biomedical Advanced Research Development Authority (“BARDA”). The Vice Chancellor stated that this fact “mit *1122 igates or possibly eliminates some of the concerns [] expressed in the 2011 Decision regarding ST-246’s future prospects.”[75]
Finding that the court was not restricted from reconsidering its prior holding that an award of lump-sum expectation damages would be too speculative, the Court of Chancery proceeded to analyze the issue on the merits.
2. The Court of Chancery Found That PharmAthene Met Its Burden Of Proving That It Was Entitled To Lump-Sum Expectation Damages
At the outset, the Court of. Chancery noted that the relevant inquiry for awarding expectation damages was: “[A]t the time of SIGA’s breach in December 2006, what were the parties’ reasonable expectations regarding PharmAthene’s ability to realize profits from the sale of ST-246 under a license agreement in accordance with the LATS[?]”[76] The Court of Chancery also acknowledged SIGA I’s observation that an award of lost profits “ ‘presupposes that the plaintiff can prove damages with reasonable- certainty.’”[77] Further, the Court of Chancery stated that “[w]hile proof of the fact of damages must be certain, proof of the amount can be an estimate, uncertain, or inexact.”[78] The court additionally noted its ability to “take into account all the circumstances of the breach, including willfulness, in deciding whether to require a lesser degree of certainty, giving greater discretion to the trier of facts.”[79] In addition to considering events that existed at the time of the breach, the trial court took into account several post-breach developments ‘ “to aid in its determination of the proper expectations at the time of the breach.’ ”[80]
The Court of Chancery then considered PharmAthene’s claim for expectation damages by considering the parties’ expectations and analyzing a damages calculation model prepared for the original trial by an experienced valuation expert,- Jeffrey L. Baliban.[81] Baliban’s report stated that PharmAthene retained him “to calculate the net present value of expected Phar- *1123 mAthene earnings from sales of the antiviral ST-246, had SIGA executed a license agreement in accordance with the terms of the LATS.”[82] At trial, Baliban presented six variations of damages calculations. Noting SIGA I’s focus on the-LATS as the appropriate yardstick for measuring damages, the court based its analysis on the “Basis 1 LATS Scenario,” where “Baliban calculated PharmAthene’s damages according to the terms of the LATS based on facts purportedly known as of December 20, 2006.”[83] The court also considered some information from another variation of Baliban’s calculations, the “Basic 2 LATS Scenario,” which was still based on the LATS but used facts known as of November 2009, nearly three years after SIGA’s breach.[84]
To determine the value to PharmAthene of a license for ST-246, Baliban used a discounted future earnings model to forecast earnings ten years into the future and then discounted them to their net present value at the time of the breach. As with any financial model, this required Baliban to make certain assumptions. A number of these assumptions were based on the PharmAthene Model, which was prepared by PharmAthene in early 2006 and used by the parties in their negotiations.[85] Specifically, Baliban used the. PharmAthene Model’s quantity and price projections for sales of ST-246 over a ten-year period from 2008 to 2017. He found that, over those ten years, PharmAthene would have sold approximately 91.9 million courses of the drug at $100 per course.
Baliban then deducted research and development costs, the costs of goods sold, and selling, general, and administrative expenses. The LATS did not address these expenses, and Baliban noted that the parties did not provide “any comprehensive analysis of costs and expense estimates or expected margins.”[86] Thus, Baliban relied on “discussions with PharmAthene management personnel” and on “independent research an supporting typical pharmaceutical costs and expenses” to come .up with these figures.[87]
Once Baliban calculated ST-246’s .discounted future earnings, he incorporated the terms of the LATS before allocating the return generated from projected sales of ST-246 to the parties, noting in his report that:
The LATS provided that, to the extent the net margin on sales to the U.S. Government exceeded 20 percent, such excess margin would be split 50-50 be-, tween PharmAthene and SIGA. The LATS also provided for license fees, milestone payments and royalties to be paid to SIGA in accordance with refer-enced -amounts and timing schedules. We apply these rates to expected future ST-246 earnings ... to yield the allocation of product earnings to PharmAth-ene and SIGA.[88]
He then applied an 84% probability of success factor to the total expected earnings from ST-246. Finally, he discounted the earnings to present value using Phar-mAthene’s weighted' average cost of capital.[89] This yielded a total payment due to *1124 PharmAthene of $1.07 billion.
The Court of Chancery scrutinizéd Bali-ban’s assumptions and inputs to aid its own analysis of the parties’ reasonable expectations at the time of breach. The court concluded that PharmAthene’s expectations of ST-246’s future prospects were informed by four primary factors: “(1) the likelihood that ST-246 ever would be sold commercially in meaningful quantities; (2) the timing of when any such sales would begin; (3) the price at which ST-246 would be sold; and (4) the quantity of ST-246 that would be sold.”[90] For each of these factors, the court engaged in a careful and thorough analysis of how they affected the lost profits calculation.
a. The Likelihood That ST-246 Would Be Sold Commercially
The Court of Chancery took note of the facts established at the original trial and upheld by SIGA I: “SIGA’s own confidence in ST-246’s prospects, which caused it internally to value ST-246 at the time of the breach at between three and five billion dollars, and SIGA’s development of ‘seller’s remorse’ which ultimately motivated its bad faith conduct.”[91] Based on-this evidence, the court found that PharmAth-ene established that, at the time of SIGA’s breach, the parties had a reasonable expectation that ST-246 would be commercialized in the near future. In other words, the .Court of Chancery reasonably took into account that it was SIGA’s increasingly bullish view of ST-246!s prospects based on what was known in December 2006 that caused it to commit a breach to-secure more of the drug’s future value for itself than it would have had from a deal consistent with the terms of the LATS.
The trial court also noted that, even though SIGA was hot awarded the BAR-DA contract until after- the January 2011 trial, “the record supports a reasonable inference that [the -parties] knew of BAR-DA’s imminent establishment” at the time of SIGA’s breach.[92]? The Court of Chancery further observed that, at the time of ■the breach, the U.S.' government had already established requirements for procuring pharmaceuticals for ST-246’s target market, the National Stockpile, and that such requirements did not include FDA approval of the drug to'be considered for acquisition.
The Coúrt of Chancery then considered whether the 84% ’’probability of success” input used in Baliban’s damages calculation was reasonable or unduly speculative.[93] That number was based on a report provided by PharmAthene’s pharmaceutical expert, Dr, Carl Peck. Dr. Peck’s report stated that, at the time of SIGA’s breach, there was an 84% to 96% chance that ST-246 would obtain FDA approval; but a more than 95% chance that the drug would meet the'criteria" for purchase into the National Stockpile. The court considered the fact that PharmAthene had a reasonable expectation at the time of breach that ST-246 would be eligible for acquisition for the National Stockpile and hit certain milestones in 2006, such as “becoming the first drug to demonstrate 100% protection against the human smallpox virus in a primate trial [and] demonstrating protection against the monkey virus in two primate trials in November 2006.”[94]
The Court of Chancery also noted that post-breach sales of ST-246 to BARDA showed that the drug was being sold to its *1125 intended purchaser, and that this demonstrated that the parties in 2006 had a reasonable expectation it would be successful. Finally, the court noted that these facts came on top of SIGA’s own conduct and beliefs as to ST-246’s promising prospects, which motivated its breach, so “PharmAthene was not alone in reasonably believing ST-246 imminently would be commercialized . with great success.”[95] Based on all of these factors, the Court of Chancery concluded that in December 2006, ST-246 had “a very high likelihood of being commercialized in the near future” and thus the “84% ‘probability of success’. factor was both reasonable and supported by the evidence.”[96]

b.The Timing Of When Sales Of ST-246 Would Begin

Baliban used 2008 as the time when sales of ST-246 would begin. In response, SIGA pointed out that the" first courses of the drug were not delivered until 2013. PharmAthene claimed that the parties used 2008 as the start date during their negotiations and that the delay in delivery was caused by SIGA’s failure to develop the drug efficiently due to its lack of experience, whereas PharmAthene would have completed the process sooner. The Court of Chancery weighed the evidence and noted that, at the time of breach, there was no evidence as to when the drug might be procured for the National Stockpile. But, taking into account the “tremendous promise in preliminary studies, [which] enabled SIGA to raise over $20 million in development funding,” and the fact that ST-246 was “granted ‘orphan drug[1] and ‘fast track’ status by the FDA,” all of which was known at the time of the breach, the Court of Chancery concluded that PharmAthene had a reasonable expectation that the U.S. government would start buying ST-246 for the National Stockpile by 2010, as opposed to 2008.[97]
c. The Price At Which ST- ' 246 Would Be Sold ■
Baliban assumed that PharmAthene would sell ST-246 for $100 per course of treatment.' PharmAthene claimed that this number was rooted in the parties’ negotiations and that it was comparable to the price the U.S. government paid for other, bioterrorism-related countermeasures. The Court of Chancery noted that Baliban independently assessed the parties’ use' of the $100 per course price in their negotiations[98] and found that the price was' consistent with the government’s prior purchases. The court also took into account the fact that the post-breach BAR-DA contract “requires the government to pay significantly more than $100 per course.”[99] On these bases, the Court of Chancery concluded that PharmAthene met its burden to show that it had a reasonable expectation at the time of breach that ST-246 would be commercialized at a price of $100 per course.
d. The Quantity Of ST-246 That Would Be Sold
Analyzing the reasonable expectation at the time of breach of the quantity of ST-246 to be sold, the Court of Chancery considered Baliban’s quantity inputs for *1126 three separate categories of sales: (1) sales to the National Stockpile; (2) sales to the DoD; and (3)-sales outside of the U.S. to foreign nations.

i. Sales Of ST-2k6 To The National Stockpile

Baliban used the sales projections in the PharmAthene model as a starting point to estimate the quantity of sales to the National Stockpile. PharmAthene calculated these sales by multiplying the size of the National Stockpile’s smallpox vaccine stockpile by the percentage of the population contraindicated for the smallpox vaccine, which it assumed to be 5%. Because ST-246 was intended to help the percentage of the population that is contraindicated for the smallpox vaccine, the contraindication rate had a directly proportional effect on the quantity of sales to the National Stockpile. Although Baliban used the PharmAthene Model’s quantity figure for National Stockpile sales, he increased those sales from 10,300,000 courses to 14,-778,000 courses. He based this increase on an observation that the size of the National Stockpile was roughly equal to the size of the U.S. population in 2002. Baliban then assumed that the size of the National Stockpile in 2006 would be -equal to the size of the U.S. population as of the July 1, 2005 U.S. Census Bureau estimate. Further, even though Baliban believed that, based on his research, the 5% contraindication rate used in the PharmAth-ene Model was understated; he kept the conservative 5% figure.
In assessing the reasonableness of these inputs, the Court of Chancery took account of the fact that the U.S. government was increasingly focused on bioterrorism counter-measures between 2002 and 2006 to conclude that it was reasonable that the size of the National Stockpile would continue to track the U.S. population during that time period, as opposed to decline as the PharmAthene Model assumed. As for the 5% contraindication rate, the court found it important that SIGA and PharmAthene appeared to incorporate this number in the projections used during negotiations. The court also noted that Baliban’s research showed a contraindication rate of between 20% and 30%, so the 5% figure was a relatively conservative estimate.
Finally, the Court of Chancery addressed some of the criticisms, presented by SIGA’s damages expert, Dr. Keith Ugone. As a general matter, the court found Dr. Ugone’s approach of challenging Baliban’s assumptions to be largely unpersuasive, stating: “Dr. Ugone’s credibility was undermined by the fact that at trial he merely attempted to discredit Baliban’s analysis without providing an alternative calculation of his own.”[100] The court nonetheless still considered his criticisms.
Dr.. Ugone criticized Baliban’s calculation for failing to account for ST-246’s competitors and the seven-year duration of the orphan drug status, explaining that these considerations would have materially reduced the quantity of National Stockpile sales as well as the time period during which those sales would have successfully been made. The Court of Chancery disagreed with these assertions on the basis that “[a]t the time of the breach, ST-246 [appeared] to have been 8,000 times more effective than its closest competing product” and that SIGA pointed to no evidence to suggest that ST-246’s orphan drug sta *1127 tus was the basis for the calculation’s use of a ten-year time period.[101] The court also reasoned that any overstatement on these grounds was 'offset by the conservative contraindication rate and Baliban’s use of a high discount rate of 23.1%. Based on these facts, the Court of Chancery found that PharmAthene proved with reasonable certainty that it had a reasonable expectation of the quantity of National Stockpile sales used in Baliban’s model. Finally, the court allocated delivery of National Stockpile sales to five years instead of the four used in Baliban’s model.

ii Sales Of ST-24.6 To The DoD

The Court of Chancery noted that there was evidence in the record that the parties “projected that .the [DoD] would purchase ST-246” although it acknowledged that those projections varied materially due to their different estimates of the size of the U.S. military population.[102] The court noted that it was unclear what PharmAthene used to come up with the estimate in the PharmAthene' Model, but that Baliban again relied on U.S. Census data. The court found that Baliban’s estimate of sales based on a military population size taken from the U.S. Census data was reasonable. But Baliban used a 10% contraindication rate for the military population, which the court rejected, finding that PharmAthene did not meet its burden of justifying why the higher rate was appropriate, and that it was reasonable to assume a 5% contraindication rate instead. The court ultimately found that, even if the parties’ projections of sales “differed significantly,” that both parties believed the DoD would buy ST-246. Based on the lowered contraindication rate, the court found that PharmAth-ene proved that “it had a reasonable expectation of selling approximately half of the quantities of ST-246 to the DoD that Baliban projected in his model.”[103]

Hi Foreign And Replacement Sales Of ST-246

Baliban’s damages calculation assumed that foreign sales would be .equal to National Stockpile sales. But the Court of Chancery noted that, although there was evidence of the prospect of sales to U.S. government agencies at the time of the breach,,, it was missing evidence to suggest material future sales to foreign countries. Further, the court .noted that there was no clear evidence presented at trialas to what criteria other countries would use to procure pharmaceuticals. Based on this lack of evidence, the court found that Phar-mAthene did not meet, its burden to show that SIGA had a reasonable expectation at the time, of breach of- selling ST-246 to foreign nations.
Finally, the, Court of Chancery addressed Baliban’s assumption that “ST-246 had a shelf life of three.to five years and ., as a result, replacement purchases to replace courses that expired would occur every four- years[104] Dr. Ugone criticized this assumption on the grounds that there were too many uncertainties as to the U.S. government’s future plans for the purchase of bioterrorism measures and that the more time .passed, the higher the likelihood was that , a competitor would enter the market.. The Court .of Chancery found these criticisms persuasive and found .there was insufficient evidence that PharmAthene had a reasonable expectation of sales to the U.S. government nine years down the road-
‡ & sjt ■ . • ?je ij; i|4
Based on its exhaustive and independent analysis of the four factors, the Court *1128 of Chancery required Baliban to make substantial adjustments to his model, most if not all of which benefitted SIGA, and held that PharmAthene met its burden of demonstrating it was entitled to lump-sum expectation damages. After Baliban submitted a revised damages calculation, on January 7, 2015, the Court of Chancery issued a Letter Opinion to address additional criticisms raised by SIGA’s expert of the revised calculation.[105] In response to SIGA’s criticisms, the court made two additional adjustments in SIGA’s favor to the damages calculation. First, SIGA objected to Baliban reducing certain selling, general, and administrative expenses for the year 2006 in the revised'calculation due- to the December 20 date''of SIGA’s breach. Second, SIGA criticized Baliban’s use of a “mid-year convention of discounting in calculating the present value of the relevant cash flows.”[106] The court noted that both changes were departures from the methodology used in Baliban’s original damages calculation and directed him to return to his previous assumptions; After making these Anal adjustments, the Court of Chancery awarded PharmAthene $113 million in contract expectation damages in a January 15, 2015 Final Order and Judgment.[107] ' -
IV, ANALYSIS
SIGA raises two primary' issues on appeal — whether the law of the ease doctrine precluded the Court of Chancery from revisiting its earlier determination that expectation damages were too speculative; and if not, whether the Court of Chancery should have found again on remand that lump-sum .expectation damages were unavailable as too speculative. We review the Court of Chancery’s law of the ease determination de novo.[108] We review its damages determination for abuse of discretion, and will uphold its factual findings unless they are clearly erroneous.[109]
A. The Court of Chancery Did Not Err In Reconsidering Expectation Damages
SIGA argues that the law of the case bound the Court of Chancery on remand to its previous determination that lump-sum expectation damages were too speculative. The Court of Chancery found otherwise, and held that SIGA I expressly instructed it to reconsider expectation damages. We 'agree with the Court of Chancery’s interpretation of SIGA I.
The law of the case doctrine, like stare decisis, “is founded on principles of efficiency, finality,' stability and respéct for the judicial system.”[110] Where the Supreme Court remands for further proceedings, “the trial court must proceed in accordance with the appellate court’s mandate as well as the law of the case established on appeal.”[111]
The law of the case doctrine did not require the Court of Chanceiy to follow its earlier decision ruling out expectation damages. It would have been error to have done so because in SIGA I this Court *1129 remanded with the specific, instruction to revisit damages, including expectation damages. In SIGA I, when discussing PharmAthene’s cross-appeal challenging the Court of Chancery’s refusal to award lump-sum expectation damages as speculative, this Court stated that it did not need to decide the issue and “reverse[d] the Vice Chancellor’s damages award and remand[ed] for him to reconsider it in light of this opinion,”[112] In other words, SIGA I remanded to the Court of Chancery to reconsider damages, which included the expectation damages now possible as a result of SIGA I.
Further guidance in SIGA I supports the Vice Chancellor’s determination. SIGA I stated that the Court of Chancery was free to “reevaluate the helpfulness of expert testimony,” which would be a meaningless statement if the court could not review expectation damages on remand.[113] SIGA I also clarified that expectation damages were possible with Type II agreements, and acknowledged that the Court of Chancery had been unable to award such damages because whether they were possible was, at the" time, an unsettled legal question.[114] Further, SIGA I expressly overturned the Court of Chancery’s prior finding that PharmAthene was entitled to damages based on a promissory estoppel theory, and directed the court to revisit damages under a contractual theory.[115]
On remand, the Court of Chancery was free to “make any order or direction in further progress of the case so long as it is not inconsistent with the decision of the appellate court, as to any question not settled by the decision.”[116] Consistent with and as required by SIGA I, the Vice Chancellor. revisited the damages award, including expectation' damages, and therefore the law of the case was not a bar to reconsideration.[117] The Vice Chancellor properly wrote. on a clean slate when he reevaluated expectation damages.
B. The Court of Chancery Did Not Abuse Its Discretion In Finding That PharmAthene Met Its Burden To Show 'That Lump-Sum Expectation Damages Were Proper
SIGA asserts that, regardless of law of the casé, the Court of Chancery determined prior to remand that expectation damages were “speculative and too uncertain, contingent, and conjectural,”[118] and should have come to the same conclusion after remand. It further argues that the court improperly relied on post-breach evidence because the same uncertainties noted by the court in its earlier decision were never resolved. In the alternative, SIGA argues that the new evidence was insufficient to firm up the earlier uncertainties in calculating expectation damages..
PharmAthene responds .that the’ Court of Chancery properly based its damages award on SIGA’s reasonable expectations at the time of its breach, evidenced by SIGA’s internal communications praising the company’s successes and questioning the merger,, and by the internal analysis prepared by Fasman for SIGA’s senior officials, which valued the company as high as $5.6 billion. PharmAthene also contends that the Court of Chancery properly considered post-breach facts for the limited purpose of determining the reasonableness of the parties’ expectations at the *1130 time of SIGA’s breach. Finally, Phar-mAthene agreed with the Court of Chancery’s analysis of the four primary drivers of its expectations of ST-246’s prospects, except for the finding that PharmAthene did not establish foreign sales prospects with sufficient certainty.[119]
We emphasize the limited scope of appellate review of a damages award. Damages awards are reviewed for abuse of discretion.[120] Thus, “we do not substitute our own notions of what is right for those of the trial judge if that judgment was based upon conscience and reason, as opposed to capriciousness and arbitrariness,”[121] . We also will uphold the Court of Chancery’s factual findings so long as they are not clearly erroneous.[122] The clearly erroneous standard applies to factual determinations based on credibility and the evidence.[123] Where there is more than one permissible determination to be drawn from the evidence, and the trial court chooses one, its finding cannot be clearly erroneous.[124]
1. The Court Of Chancery Applied The Correct Legal Standard
SIGA argues as an initial matter that the Vice Chancellor should have simply followed his prior determination because expectation damages are difficult to measure for undeveloped products and new businesses, and especially so in the case of new drugs subject to regulatory approval.
As a preliminary matter, and perhaps most significant, SIGA I directed the Court of Chancery to reconsider its damages award. ' SIGA I also' instructed the Court of Chancery to reevaluate the helpfulness of expert testimony, and reconsider an award of lump-sum expectation damages in light of the opinion. These instructions were not ambiguous. SIGA I required the Court of Chancery to take a fresh look at the expert testimony in light of the clarified legal point that lump-sum expectation damages were available.
The Court of Chancery followed SIGA I’s mandate. First, it applied the correct legal standard to evaluate expectation damages. As this Court said in Duncan v. Theraix, Inc.:
[T]he standard remedy for breach of contract is based upon the reasonable expectations of the parties ex ante. This principle of expectation damages is measured by the amount of money that would put the promisee. in the same position as if the promisor had performed the contract. Expectation damages thus require the breaching promi-sor to compensate the promisee for the promisee’s reasonable expectation of the value of the breached contract, and, hence, what the promisee lost.[125]
The Court of Chancery recognized this Court’s admonition in SIGA I that *1131 expectation damages must be proven with reasonable certainty, and “no recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative.”[126] But it also confirmed what has been established by our courts — that certain presumptions apply when evaluating harm and loss. Where the injured party has proven the fact of damages — meaning that there would have been some profits from the contract — less certainty is required of the proof establishing the amount of damages.[127] In other words, the injured party need not establish the amount of damages with precise certainty “where the wrong has been proven and injury established.”[128]
The Vice Chancellor found that Phar-mAthene firmly established the fact of damages. SIGA’s breach caused Phar-mAthene to lose out on the opportunity to develop the vaccine, to enhance its reputation, and to access government funding to support continued drug development.[129] PharmAthene “was poised to commercialize profitably ST-246 in a way that it was reasonably certain would be profitable and ... SIGA deprived it of that opportunity.”[130] The Court of Chancery also applied the established presumption that doubts about the extent of damages are generally resolved against the breaching party. As a corollary to this presumption, the court noted it could take into account the willfulness of the breach in deciding whether to require a lesser degree of certainty.[131]
SIGA argues that the Court of Chancery applied the “wrongdoer rule” punitively, because it is only to those uncertainties caused by the breach that the presumption applies. SIGA is correct that the trial court did not have unbridled authority to dress up punitive damages as expectation damages by importing the willfulness of the breach into the damage award. And it is not every contract case where the court should assess the bona fides of the breaching party. But in a case about expectation damages caused by breach of a Type II agreement, where the wrongdoer caused uncertainty about the final economics of the transaction by its failure to negotiate in good faith, willfulness is a relevant factor in deciding the quantum of proof required to establish the damages amount.[132]
*1132 The Vice Chancellor applied the wrongdoer rule in a limited.and proper way. For instance, as the Vice Chancellor found, if SIGA had negotiated in good faith under the LATS, and the parties had executed a final agreement, there would have been no uncertainty about the research and development costs under the final license agreement.[133] The court resolved the uncertainties about those costs against SIGA. Where uncertainty could not be traced to SIGA’s breach, the Court of Chancery did not resolve the uncertainty against'SIGA, For example, the court rejected certain assumptions about foreign sales used in Baliban’s model.[134] The court found that these assumptions were not supported by sufficient evidence and that it was “inappropriate to award lost profits oh foreign sales because those sales were too speculative as of December 2006.”[135] The court did not apply the wrongdoer rule to resolve all uncertainty against SIGA, whére SIGA’s breach was not the cause of the lack of information.
. In addition, the LATS’s core financial terms were not in dispute and did not have to be construed oneway or the other. SIGA I stated that “[i]n this case, the Vice Chancellor made [the factual finding], supported by the record, [that] the parties memorialized the basic terms of a transaction in the LATS.”[136] “[T]he LATS was intended to capture The key economic components’ of any license, agreement to which the two sides would agree regarding ST-246.”[137] The Court of Chancery did not have to resort to the wrongdoer rule to construe the LATS’s financial terms, which provided the framework for the court’s damage award.
2. The Court Of Chancery Relied On Post-Breach Evidence For A Limited Arid Proper Purpose
The Court of Chancery correctly noted that “[u]nder Delaware law, the. standard remedy for breach of contract is based on the reasonable expecta *1133 tions of the parties that existed before or at the time of the breach.”[138]. The court also properly acknowledged that Phar-mAthene must show that there would be some future profits, but after this showing, the amount of such profits may be an estimate.[139] SIGA does not dispute that the court could consider post-breach evidence when determining the reasonable expectations of the parties before or at the time of the breach.[140] Instead, SIGA argues that the' Court of Chancery improperly used post-breach evidence “to cure the fatally speculative nature of the damages at the time of the breach.”[141] The record does not support SIGA’s argument.
The Court of Chancery recognized that post-breach • evidence could be used “in order to aid in its determination of the proper expectations as of the date of the breach,” but relied on .such evidence “sparingly.”[142] According to the court, it also limited the use of such evidence to the parties’ expectations, ¡ánd “in all .other respects” determined'that the .post-breach evidence was “irrelevant” to measure expectation damages 'at the time of‘the breach.[143] We find -after reviewing the record that the Court’ of Chancery properly limited the use of post-breach evidence to confirm its conclusions as to the parties’ reasonable expectations at the time of breach, or used the evidence to adjust the damages award in SIGA’s favor;
, First, the Court of Chancery observed that' even though SIGA.did not secure the BARDA contract until after the 2011 trial, there was a reasonable inference that the parties knew this contract was imminent at *1134 the time of SIGA’s breach.[144] The Court of Chancery also found ST-246’s post-breach sale to BARDA supported its-conclusion that PharmAthene had a reasonable expectation at the time of SIGA’s breach that the U.S. government would contract to buy ST-246 in the near future, because the drug was actually sold to its intended buyer. These inferences supported ST-246’s commercial viability at the time of SIGA’s breach, including SIGA’s own optimism and high valuation of the drug’s prospects.[145]
SIGA’s internal emails revealed that Vice President Konatich, Chief Scientific Officer, Hruby, and attorney Fasman, all questioned the need for a business collaboration with PharmAthene given the success of ST-246.[146] Additionally, Hruby’s emails showed that government agencies were interested in a potential acquisition in the near future,[147] and that SIGA received over $21 million in grant money because agencies recognized the potential of ST-246.[148] SIGA also publicly announced the successful results of ST-246 in primate trials and was able to sell its stock at a premium following its positive developments. Additionally, PharmAthene was willing to consider giving SIGA more favorable terms than those contemplated in the LATS,[149] likely because it recognized ST-246’s potential for commercial success and because SIGA was balking at going forward because of its self-proclaimed view that ST-246 had a conservative value of $3 billion[150] and an optimistic value of $5.6 billion.[151] Based on these facts, there was substantial evidence, including post-breach information about the BARDA contract, that the parties had a reasonable expectation at the time of SIGA’s breach that ST-246 would be commercialized in the near future.
Finally, the Court of Chancery noted that BARDA contracted to buy ST-246 for “significantly” more than $100 per course (SIGA is eligible to receive at least $180 per course under the contract) supported its conclusion that, at the time of SIGA’s breach, PharmAthene had a reasonable expectation of commercializing ST-246 for $100 per course.[152] Although around the time of SIGA’s breach, Fasman viewed PharmAthene’s $100 per course of treatment price as “excessive” and assumed a price of $75,[153] SIGA was willing to continue negotiations based on the assumptions in the PharmAthene Model, which used the $100 figure.[154] According to Baliban’s research, the $100 per course of treatment price was comparable to the price the U.S. *1135 government paid for similar pharmaceutical countermeasures.
The fact that BARDA agreed to pay 80% more per course confirmed that the parties’ expectations at the time of SIGA’s breach were reasonable. Had the court given more weight to the • post-breach BARDA contract, it could have concluded that the $100 price per course expectation at the time of breach was unreasonable for being too low. The Court of Chancery did not give undue weight to post-breach evidence, and properly limited the post-breach. evidence to corroborate other facts establishing the. expectation of the parties at the time of the breach.[155]
3. The Court Of Chancery Used The LATS Economic Terms To Determine Expectation Damages
SIGA argues that the Court of Chancery found in its 2011 Decision that the parties would have reached an agreement on terms substantially different from those set forth in the LATS. We read the 2011 Decision otherwise. The Vice Chancellor stated:
I [ ] find that, but for SIGA’s bad faith negotiations, the parties likely would have reached agreement on a transaction generally in accordance with the LATS. PharmAthene was willing to agree to a license agreement for ST-246 on terms that varied “to some extent” from the LATS .... Had SIGA engaged in good faith negotiations, I am convinced that a license agreement between PharmAthene and SIGA for ST-246 would have resulted in terms no less favorable to PharmAthene than the 50/60 profit split it already had mentioned and an increase in the upfront and milestone payments from a total of ,.$16 million, as specified in the LATS to something in the range of $40 million.[156]
Athough the parties might have agreed to modifications of the LATS in SIGA’s favor given 'ST-246’s recent successes, had SIGA not breached its obligation to negotiate in good faith toward a license agreement in accordance with the LATS, fairly read the Vice Chancellor found that the parties would still have reached an agreement that was “generally in accordance with jthé LATS.”[157] The financial terms of the ÍATS were a sufficiently certain basis to calculate damages, and the Court of Chancery did not err in rely on the LATS financial terms used by Baliban in his financial model.
SIGA also argues that the Court of Chancery deviated from the material financial terms of the LATS. Once again the record does not support SIGA’s argument. The Court of Chancery used'Baliban’s Basis 1 damages calculation, which incorporated the LATS economic terms. After Baliban prepared a projection of ST-246’s future profit using inputs from the Phar-mAthene Model as well as assumptions that were based on his research, he applied the key LATS economic terms to the calculation. That is, the license fees, milestone payments, and royalties PharmAth-ene owed SIGA were all applied to the calculation before earnings from ST-246 were allocated to the parties. Thus, the *1136 economic terms of the LATS were incorporated into Baliban’s damages calculation, which served as the basis for the Court of Chancery’s analysis of the damages award.
Furthermore, in its Remand Order, the Court of Chancery directed Baliban to apply the economic terms of the LATS to its calculation of damages and altered the timing of when certain upfront and milestone payments would have been made. The court gave SIGA the opportunity to comment on the revised calculations.[158] The Remand Order accounted for the license fee payments and the milestone payments, all of which PharmAthene owed to SIGA under the express economic terms of the LATS. Thus, the court’s analysis in its Remand Opinion and its instructions in the Remand Order were based on the economic terms of the LATS. ,
4. The Court Of Chancery’s Factual Findings Were Not Clearly Erroneous
The Court of Chancery took into account SIGA’s own conduct and beliefs about ST-246’s prospects before the breach, and painstakingly considered the relevant factors underlying Baliban’s damages calculation. In evaluating the evidence, the Court of Chancery first took account of ST-246’s successes and SIGA’s own optimism about the drug’s prospects. Specifically, it noted that the criteria for purchase into the National Stockpile was already known at the time of SIGA’s breach, and the. parties had a reasonable expectation that ST-246 would meet that criteria. It also noted that FDA approval was not one of the requirements for being considered for the National Stockpile, which weakened SIGA’s argument that ST-246’s prospects were too speculative because of the uncertainty of obtaining FDA approval. Had the parties truly believed that the success of the drug was premised on FDA approval, they would have been much more conservative in their valuations, and SIGA might not have walked away from the merger or a deal consistent with .the LATS.
Further, the Court of Chancery considered SIGA’s damages expert’s criticisms of Baliban’s' damages calculation and either found them wanting or made the requested adjustments. For example, SIGA’s expert criticized Baliban’s damages calculation for failing to consider competitors and failing to account for the seven-year duration of the “orphan drug” status. The court noted, however, that the 5% contraindication rate used in Baliban’s model was conservative as compared to Baliban’s independent research, which showed contraindication rates of between 20% and 30%.[159] Thus, the court reasoned that the shortcomings of Baliban’s calculation were offset by the use of a conservative contradiction rate. It also noted that Baliban’s use of a high discount rate of 23.1% compensated for these criticisms. The court considered and responded to SIGA’s expert’s criticisms, but could not rely on an alternative model for comparison because SIGA did not provide one.' Also, in the January 7, 2015 Letter Opinion, the court directed Baliban to adhere to his original assumptions, which further reduced Phar-mAthene’s damages award.[160] In this regard, it is worth noting that this is another instance where SIGA faults the Vice Chancellor for using a more conservative approach than he could have given the evi *1137 dence. When it was deciding to breach, SIGA’s internal valuation used a contraindication rate of 15%.[161] The Vice Chancellor would have been within his discretion to hold SIGA to its own contemporaneous estimate.
On top of the changes made in response to SIGA’s expert, the Court of Chancery conducted its own analysis and adjusted Baliban’s calculations. Specifically, the court changed' the start date assumption for ST-246 sales, and adjusted the assumed sales to the National Stockpile, both in SIGA’s favor. The court also found that PharmAthene did not prove that it had a reasonable expectation of commercializing ST-246 outside of the U.S. at the time of SIGA’s breach. Additionally, the court lowered the contraindication rate for the military population from 10% to 5%, because PharmAthene failed to justify the higher rate. The court also amended PharmAthene’s projected recognition of its milestone payment obligations under the LATS to reflect the new timing of ST-246 sales. These changes demonstrate that the Court of Chancery carefully analyzed the factors used in Baliban’s model to avoid an excessive' award. Ultimately, the court awarded PharmAthene $113 million in expectation damages — less than 11% of the $1.07 billion damages figure in Baliban’s model.
SIGA is poorly positioned to argue that the parties’ expectations about; ST-246’s prospects at the time of the breach were too speculative. At the time of the breach, SIGA internally valued ST-246 conservatively at $3 billion[162] and optimistically at $5.6 billion.[163] A letter from SIGA’s attorney to PharmAthene’s attorney stated that SIGA valued' the drug at over $5 billion.[164] Right before the breach, ST-246 received $21.9 million in grant money from the National Institute, of Allergy,and Infectious Disease and the National Institutes of Health to address .SIGA’s cash shortage, allowing SIGA to continue development, of a drug that was demonstrating promise.[165] These, grants reflected the organizations’ confidence in ST-246, confirming SIGA’s optimism about the ..drug’s prospects. It was precisely because SIGA believed that ST-246 was worth $3-to $5.6 billion that it .did. not wish to. share' the upside with PharmAthene under LATS terms and why SIGA refused to consummate a final agreement.
SIGA is also poorly positioned to argue that profits were entirely speculative because ST-246 was an experimental drug. Both of these companies were in the business of developing pharmaceuticals for use against biological warfare. They understood that the government was a likely near-term purchaser.[166] ' SIGA confidently announced on July 13, 2006 that ST-246 was “its lead smallpox drug candidate” and that it had “successfully' -completed the first planned human clinical safety trial.”[167] SIGÁ had met the scieritific milestones for ST-246, and sought the bridge financing because of its confidence in the drug.[168] The additional government fund *1138 ing awarded to SIGA to complete development of ST-246 in September 2006 also undercuts SIGA’s argument that this was merely an experimental drug.[169] This was not a situation where profits were entirely speculative — SIGA believed it was on the cusp of bringing ST-246 to market.
•We respectfully disagree with the dissent that PharmAthene should be limited to reliance damages, which, as the Court of Chancery found, would be no remedy at all for SIGA’s bad faith breach.[170]™ Although the dissent characterizes SIGA I as “unclear,” we find nothing unclear about the instructions from this Court to the Court of Chancery on- remand. We instructed the court to determine anew whether expectation damages should be awarded, which included a specific instruction to reconsider the helpfulness of expert testimony directed to expectation damages. Further, faced with PharmAthene’s argument that the court erred by failing to award lump-sum expectation damages, we “remand[ed] for him to reconsider it in light of [the SIGA I] opinion.” The Court of Chancery followed this Court’s mandate, painstakingly applied accepted principles of law to a detailed record, and exercised its broad discretion for a second tipie to fashion a damages remedy.[171]
The dissent’s extended discussion of cases from other jurisdictions, including New York, and its fear of falling out of step with other leading commercial jurisdictions, suggests that its main dissatisfaction is with SIGA I and the rule it adopted permitting the recovery of expectation damages for bad faith breach of Type II agreements. We note, however, that despite SIGA’s concerns about the precedent set in SIGA I, the decision is the law of the case. Whether it was correctly decided was not raised by the parties and is not before üs in this appeal.[172]
The Court of Chancery’s opinion reflects a reasoned and thorough approach to evaluating the evidence underlying PharmAth-ene’s damages claim. In view of our standard of review and of the evidence that was before the trial court, the Court of Chancery did not abuse its discretion or make conclusions that were clearly erroneous when it awarded PharmAthene lump-sum expectation damages on remand.
Y. CONCLUSION
The law of the case doctrine did not prevent the Court of Chancery from reconsidering its prior finding that lump-sum expectation damages were too speculative. Instead, the Court of Chancery was required to reevaluate the helpfulness of expert testimony and reconsider the damages award in light of SIGA I’s guidance. That is precisely what the Court of Chancery did., Further, the Court of Chancery did not abuse its discretion in finding that PharmAthene met its burden of proving its expectation damages with reasonable certainty, and the court’s factual findings were not clearly erroneous.
*1139 The judgment of the Court of Chancery is affirmed.

. SIGA Techs. Inc. v. PharmAthene, Inc., 67 A.3d 330, 347 (Del.2013) [hereinafter SIGA I].

. PharmAthene, Inc. v. Siga Techs., Inc., 2015 WL 220445, at *1 (Del. Ch. Jan. 15, 2015) [hereinafter Final Remand Order],

. Beard Research, Inc. v. Kates, 8 A.3d 573, 613 (Del. Ch. 2010), aff'd sub. nom. ASDI, Inc. v. Beard Research, Inc., 11 A.3d 749 (Del.2010); Del. Express Shuttle, Inc. v. Older, 2002 WL 31458243, at *15 (Del.Ch. Oct. 23, 2002) (quoting Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods., Inc., 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992)).

. Cura Fin. Servs. N.V. v. Elec. Payment Exch., Inc., 2001 WL 1334188, at *20 (Del. Ch. Oct. 22, 2001) (citing Restatement (Second) of Contracts § 352 cmt. a (1981)).

. Beard, 8 A.3d at 613 ("Public policy has led Delaware courts to show a general willingness to make, a wrongdoer, '-bear,the risk of uncertainty of ,a damages. calculation where the calculation cannot be mathematically proven.’ ”) (quoting Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC, 2010 WL 338219, at *23 (Del. Ch. Jan. 29, 2010) (citing Duncan v. TheraTx, Inc., 775 A.2d 1019, 1023 (Del. 2001); Henne v. Balick, 146 A.2d 394, 396 (Del. 1958); Gotham P’rs, L.P. v. Hallwood Realty P’rs, L.P., 855 A.2d 1059, 1067 (Del. Ch. 2003); Dionisi v. DeCampli, 1995 WL 398536, at *18 (Del. Ch. June 28, 1995)).

.The background- facts are taken from the extensive record in both appeals.

. PharmAthene, Inc. v. Siga Techs., Inc., 2011 WL 4390726, at *3 (Del. Ch. Sept. 22, 2011) [hereinafter 2011 Opinion],

. App. to Answering Br. at 1498 (The License Agr. Term Sheet).

. Id.‘

. Id. at'1499.

. App. to Opening Br. at 132 (Bridge Loan Agreement § 2.3(a)):
Upon any termination of the Merger Term Sheet ..., termination of the Definitive Agreement relating to the Merger, or if a Definitive Agreement is not executed ..., SIGA and PharmAthene will negotiate in good faith with the intention of executing a definitive License Agreement in accordance with the terms set forth in the [LATS] and [SIGA] agrees for a period of 90 days during which the definitive license agreement is under negotiation, it shall not, directly or indirectly, initiate discussions or engage in negotiations with any corporation, partnership, person or other entity or group concerning any Competing ¡Transaction without the prior written consent of the other party or notice from the other parly that it desires to terminate discussions hereunder.

.Id. at 271 (Merger Agreement^ 12.3):
Upon any termination of, this Agreement, SIGA and PharmAthene will negotiate in good faith with the intention of executive a definitive License Agreement in accordance with the terms set forth in the [LATS] and SIGA agrees for a period of 90 days during which the definitive license agreement is under negotiation, it shall not ... initiate discussions or engage in negotiations with any corporation, partnership, person or other entity or group concerning any Competing Transaction ... without the prior written consent of PharmAthene....

. App. to Answering Br. at 807-08 (Email ' Chain between Hruby and Konatich).

. Id. at 807.

. Id.

. Id. at 811 (SIGA Press Release).

. Id: at 1133 (Email from Richman to Wright),

. Id. at 1135 (Email from-Hruby to Drap-kin). .

. App. to Answering Br. at 1135.

. Id.

. Id.

. Id.

. Id. at 2574 (Trial Test, of Hruby).

. Id. at 1141 (Email from Fasman to Hruby).

. App. to Answering Br. at 1166-70 (SIGA ST-246 Market ‘Potential Presentation).

. 2011 Opinion at *9.

. Id.

. App. to Answering Br, at 1189-201 (Fas-man Emails).

. Id. at 1189 ("Nonetheless, PharmAthene’s projection is clearly erroneous in several important respects. For example, PharmAthene assumes that the drug is useful only for populations where vaccine is contra-indicated. PharmAthene also grossly understates the potential for foreign sales. At the same time, PhármAthene assumes that [ST-246] can be sold for $ 100/treatment in the U.S. arid $ 150/treatment abroad, prices that appear to us excessive.”).

. Id. at 1190-91.

. Id., at 1189 (emphasis added). Fasman also stated that he intended to share these documents with PharmAthene at' a meeting the following afternoon. Id.

. , Id. at 1189.

. Id. at 1190.

. The Court of Chancery noted thát "[c]on- ■ traindication rate refers- to the fact that, for any number of reasons, a vaccine will not be effective at preventing or curing a disease for some particular individuals.” PharmAthene, Inc. v. SIGA Techs., Inc., 2014 WL 3974167, at *15 n. 70 (Del. Ch. Aug. 8, 2014) [hereinafter Remand Opinion].

. App, to Answering Br. at li90.

. Id. at 1200.

. Id, at 1190,

. Id. PharmAthene assumed a 10% contraindication rate for military personnel, but SIGA assumed that the government would purchase ST-246 for 50% of the then-current military population because that population would grow.

. Id.

. Id. at 1193 (emphasis added).

. Id. at 1195.

. Id. (emphasis added).

. Id. (emphasis added).

. Id.

. Id. at 1204 n.l (Letter from Coch to Ol-stein) (emphasis added).

. Id. at 1205 (Letter from Olstein to Coch).

. Id. at 1207 (Letter- from Coch to Olstein).

.On this point, the Court of Chancery stated:
I [] find that, but for SIGA’s bad faith negotiations, the parties likely would have reached agreement on a transaction generally in accordance with the LATS. Phar-mAthene was willing to agree to a license agreement for ST-246 on terms that varied "to some extent” from the LATS.... Had SIGA engaged in good faith negotiations, I am convinced that a license agreement between PharmAthene and SIGA for ST-246 would have resulted in terms no less favorable to PharmAthene than the 50/50 profit split it already had mentioned and an increase in the upfront and milestone payments from a total of $16 million, as specified in the LATS to something in the range of $40 million.
2011 Opinion at *38.

. See 2011 Opinion.

. Id. at *37.

. Id. at *35.

. SIGA I, 67 A.3d at 347 (Del. 2013).

. Id. at 348.

. Id. ("The promise to negotiate in good faith for a definitive license agreement in accordance with the LATS’s terms is 'expressly included in both the Bridge Loan and Merger Agreements.”); 2011 Opinion at *21 ("By executing the Bridge Loan Agreement and the Merger Agreement, both SIGA and Phar-mAthene became bound by the terms of those contracts.”).

. SIGA I at 348.

. Id. at 349 (quoting Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543, 548 (2d Cir. 1998)).

. Id. at 349-50 (discussing Goodstein Constr. Corp. v. City of New York, 80 N.Y.2d 366, 590 N.Y.S.2d 425, 604 N.E.2d 1356, 1360 (1992); Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc., 519 F.3d 421, 428-30, 428 n.7, 429, 430 (8th Cir. 2008) (citations omitted); Venture Assocs. v. Zenith Data Sys. Corp., 96 F.3d 275, 277, 278-79, 281 (7th Cir. 1996)).

. Id. at 350-51.

. Id. at 351 n. 99 (citing Callahan v. Rafail, 2001 WL 283012, at *1 (Del. Super. Mar. 16, 2001) (citation omitted) ("It is well-settled law that 'a recovery for lost profits will be allowed only if their loss is capable of being proved, with a reasonable degree of certainty. No recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative.’ ”)).

. Id. at 351-52.

. Id. at 353.

. Id.

. See Ex. A to Opening Br. (Oral Arg, on PL’s Mot. to Reopen the R., Aug. 15, 2013).

. Id. at 31 ("[A]s to all this new evidence, I am going to have to decide, number one, does it come in at all, is it relevant, and does it meet the requirements.”).

. PharmAthene, Inc. v. Siga Techs., Inc., 2014 WL 3893449 (Del. Ch. Aug. 8, 2014) .. [hereinafter Remand Order].

. Remand Opinion at *3.

. Id.) SIGA I at 353.

. Remand Opinion at *3.

. Id.

. Id. at *6.

. Id. at *4,

. Remand Opinion at *4 (quoting. SIGA I at 351).

. Id.

. Id. at *5.

. Id. at *6.

. Id. at *8.

. Id. at *7 (citing SIGA I at 351 n. 99).

. Id. at *8 (quoting Agilent Techs., Inc. v. Kirkland, 2010 WL 610725, at *29 n. 271 (Del. Ch. Feb. 18, 2010)); Robert L. Dunn, Recovery of Damages for Lost Profits § 1.3 (6th ed. 2005); Williston on Contracts § 64:9 (4th ed. 2000) ("Thus, it is now well established that the uncertainty that prevents recovery is uncertainty as to the fact of damage and not as tó its amount.”).

. Id. (quoting Cura, 2001 WL 1334188, at *20 (internal citations omitted)); Beard Research, Inc v. Kates, 8 A.3d 573, 613 (Del. Ch. 2010) (“Public policy has led Delaware courts to show a general willingness to make a wrongdoer ‘bear the risk of uncertainty of a damages calculation where the calculation cannot be mathematically proven.’ ”) (quoting Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC, 2010 WL 338219, at *23 (Del. Ch. Jan. 29, 2010)); Restatement (Second) of Contracts § 352 cmt. a (1981).

. Id. at *9 (quoting Comrie v. Enterasys Networks, Inc., 837 A.2d 1, 17 (Del. Ch. 2003)). The Court of Chancery noted that “[f]or example, while it is appropriate to consider the fact that, to date, SIGA has sold ‘X dollars' worth of ST-246 to evaluate whether at the time of the breach PharmAthene had a reasonable .expectation of commercializing ST-246, it would be inappropriate to use ‘X dollars' as the basis of a damages award because it was neither known nor knowable at the time of SIGA's breach.” Id. at *9.

. Id. at *9-10. Baliban was a Senior Vice President in the Securities and Finance practice at National Economic Research Associates, Inc., a global economic consulting firm. The Court of Chancery observed that SIGA failed to present an alternative damages mod *1123 el, and instead was content to have its experts criticize PharmAthene’s model.

. App. to Answering Br. at 1453 (Baliban’s Report).

. Remand Opinion at *9.

. Id. at *9 n. 45.

.Id. at *10.

. App. to Answering Br. at 1473 (Baliban’s Report).

. Id.

. Id. at 1475.

. Because PharmAthene only had equity financing as of December 2006, the WACC rate was equivalent to PharmAthene’s cost of capital. Id. at 1475-76.

. Remand Opinion at *10.

. Id. at *11.

. Id.

.Id.

.Id. at *12 n. 57.

. Id. at *12.

. Id.

. Id. at *13.

. The parties used the $100 per course of treatment price point in their own negotiations because this price was incorporated into the, PharmAthene Model which SIGA was comfortable using in negotiations before its breach, even though this price was “excessive” from SIGA’s perspective. App. to Answering Br. at 1189 (Fasman Email).

. Remand Opinion at *14 (emphasis in original).

. Id. at *16 n. 78. The Court of Chancery noted that the court "has been critical of such an approach in the past.” Id. (citing Agilent, 2010 WL 610725, at *29). The court further stated: “If the Court were to credit completely the testimony of Dr. Ugone, it would never be possible to award expectation damages in a case such as this one, no matter how much the underlying breach of contract could be attributed to the breaching'party's bad faith,” Id.

. Id. at *16.

. Id. at *17:

. Id.

. Id. at *18.

. Re: PharmAthene, Inc. v. SIGA Techs.; Inc., 2015 WL 98901, at *1-2 (Del. Ch. Jan. 7, 2015) [hereinafter Letter Opinion],

. Id. at *1.

. Final Remand Order at *1.

. Cede & Co. v. Technicolor, Inc., 884 A.2d 26, 36 (Del. 2005).

. Gatz Props., LLC v. Auriga Capital Corp., 59 A.3d 1206, 1212 (Del. 2012) (citing William Penn P’ship v. Saliba, 13 A.3d 749, 758 (Del. 2001)); Weinberger v. UOP, Inc., 457 A.2d 701, 715 (Del. 1983).

. Cede, 884 A.2d at 39 (citing Gannett Co. v. Kanaga, 750 A.2d 1174, 1181 (Del. 2000)).

. Id. at 38 (citing Ins. Corp. of Am. v. Barker, 628 A.2d 38, 40 (Del, 1993)).

. SIGA I at 353.

. Id.; Remand Opinion at *3.

. S/GA 7 at 350-52.

. Id. at 347-48.

. Cede, 884 A.2d at 39 (citing Barker, 628 A.2d at 41).

. Remand Opinion at *3-6; SIGA I at 353.

. Opening Br. at 22 (citing 2011 Opinion at *37).

. PharmAthene did ' not cross-appeal this finding in light of the abuse of discretion and clearly erroneous standards of review that apply to the Court of Chancery’s decision.

. Gatz, 59 A.3d at 1212 (Del. 2012); Weinberger, 457 A.2d at 715 (“[The Court of Chancery has] broad discretion ... to fashion s.uch relief as the facts of a given case may dic-tate_”).

. Gatz, 59 A.3d at 1212 (quoting William Penn P’ship v. Saliba, 13 A.3d 749, 758 (Del. 2001)) (quotations omitted).

. Id. (citing Cede, 758 A.2d at 491); Bank of N.Y. Mellon Trust Co. v. Liberty Media Corp., 29 A.3d 225, 236 (Del. 2011).

. Bank of N.Y. Mellon Trust Co., 29 A.3d at 236.

. Id.

. 775 A.2d 1019, 1022 (Del. 2001) (footnotes omitted),

. 67 A.3d at 351 (quotations and citations omitted).

. Beard Research, Inc. v. Kates, 8 A.3d 573, 613 (Del. Ch. 2010), aff'd sub. nom. ASDI, Inc. v. Beard Research, Inc., 11 A.3d 749 (Del. 2010); Del. Express Shuttle, Inc. v. Older, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002) (quoting Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods., Inc., 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992)).

. Del. Express, 2002 WL 31458243, at *17 ("Responsible estimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages.”).

. Remand Opinion *8 n. 41.

. Id.

. Id. at *8 (citing Cura, 2001 WL 1334188, at *20 (citing Restatement (Second) of Contracts § 352 cmt. a (1981) ("A court may take into account all the circumstances of the breach, including willfulness, in deciding whether to require a lesser degree of certainty, giving greater discretion to the trier of the facts.”)).

. Courts in Delaware and other jurisdictions have frequently applied the "wrongdoer rule” where the wrongdoer’s breach contributed to uncertainty over the amount of damages. See Duncan, 775 A.2d at 1023 ("The . intuition behind this rule is that .the issuer-defendant should bear the risk of uncertainty in the share price because the defendant’s acts prevent a court from determining with ' any degree of certainty what the plaintiff would have done with his securities had they been freely alienable.”) (quotations omitted); Agilent, 2010 WL 610725, at *26-27 (”[I]n *1132 cases where a specific injury to the plaintiff cannot be established, the defendant’s actual gain may be considered.”) (citations omitted); Beard, 8 A.3d at 613; Thorpe v. CERBCO, Inc., 1993 WL 443406, at *963 (Del. Ch. Oct. 29, 1993); Am. Gen. Corp. v. Cont’l Airlines Corp., 622 A.2d 1, 10 (Del. Ch. 1992) (‘‘[Bec.ause the acts of a wrongdoer defendant created uncertainties,] fundamental justice requires that, as .between [the plaintiff] and [the defendant], the perils of such.uncertainty should be laid at the defendant's door’") (quoting Madison Fund, Inc. v. Charter Co., 427 F.Supp. 597, 608 (S.D.N.Y. 1977)); Tanner v. Exxon Corp., 1981 WL 191389, at *2 (Del. Super. July 23, 1981) (citing 5 Corbin on Contracts § 1020 (Rev. ed. 1969)); see also Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 565, 51 S.Ct. 248, 75 L.Ed. 544 (1931) ("[W]hatever uncertainty there may be in this mode of estimating damages is an uncertainty caused by the defendants’ own wrongful act; and justice and sound public policy alike require that he should bear the risk of the uncertainty thus produced.’’) (quoting Gilbert v. Kennedy, 22 Mich. 117, 131 (1871)); Boyce v. Soundview Tech. Grp., 464 F.3d 376, 391 (2d Cir. 2006) ("[W]here .the existence of damage is certain, and the only uncertainty is as to its amount, ,.. the burden of uncertainty as to the amount of damage is upon the wrongdoer.”) (quotations and citations omitted); 17A Am. Jur. 2d Contracts § 611; Restatement (Second) of Contracts § 352 cmt. a (1981).

. Remand' Opinion at *14 n. 67 ("Had SIGA negotiated in good faith, [the parties] would have reached a license agreement in which PharmAthene would have controlled ST-246’s development and would have been in a position to know the exact amount of such cost figures. ”).

. Id. at *17.

. Id. at *17 n. 84.

. SIGA I at 351. SIGA I also reiterated and affirmed that "but for SIGA’s bad faith negotiations, the parties would have consummated a license agreement,” Id.

. Remand Opinion at *5.

.Id, at *7 (citing Duncan, 775 A.2d at 1022 (Del. 2001)). The Court of Chancery noted:
Proof of the fact of damages in a lost profits case means proof that there would have been some profits. If the plaintiff’s proof leaves uncertain whether plaintiff would have made any profits at all, there can be no recovery. But once this level of causation has been established for the fact of damages, less certainty (perhaps none at all) is required in proof of the amount of damages.... [P]roof of the amount can be an estimate, uncertain, or inexact.
Id. at *8 (quoting Agilent, 2010 WL 610725, at *29 n. 271 (citations omitted)). The court also accounted for the wrongdoer rule, noting:
Doubts [about the extent of damages] are generally resolved against the party in breach, A party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred. A court may take into account all the circumstances of the breach, including willfulness, in deciding whether to require a lesser degree of certainty, giving greater discretion to the trier of the facts. Damages need not be calculable with mathematical accuracy and are often at best approximate.
Id. (citing Cura, 2001 WL 1334188, at *20) (emphasis in original).

. Agilent, 2010 WL 610725, at *29 n. 271.

. Remand Opinion at *9.

. Opening Br. at 33.

. Remand Opinion at *9 (citing Comrie, 837 A.2d at 17; Cura, 2001 WL 1334188, at *23-24 (considering evidence of post-breach transactions to calculate a damages award); Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp., 378 F.Supp.2d 459, 465 (D.Del.2005)); see also Sinclair Ref. Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 697-98, 53 S.Ct. 736, 77 L.Ed. 1449 (1933) (“The law will ■make the best appraisal that it can, summoning to its service whatever aids it can command, At times the only evidence available may be that supplied by testimony of experts _ But a different situation is presented if years have gone by before the evidence is offered. Experience is then available to correct uncertain prophecy. Here is a book of Wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within.”) (citations omitted).

. Remand Opinion at *9.

. Id. ("Although officially BARDA did not come into existence until roughly contemporaneously with SIGA’s bad faith conduct, the record supports a reasonable inference that both SIGA and PharmAthene knew of BAR-DA’s imminent establishment.’’).

. The Court of Chancery specifically noted the facts of SIGA’s "own confidence in ST~ 246's prospects, which caused it internally to value ST-246 at the time of the breach at between three and five billion dollars, and SIGA's development of 'seller’s remorse’ which ultimately motivated its bad faith conduct,” Id.

. App. to Answering Br, at 807 (Email from Hruby to Konatich); id. at 1141 (Email from Fasman to Hruby).

. Id. at 1135 (Email from Hruby to Drap-kin).

. Id. at 808 (Email from Hruby to Kona-tich).

. Id, at 1205 (Letter from Olstein to Coch).

. Id. at 1195.

.- Id. at 1204 n.l (Letter from Coch to Ol-stein).

. Remand Opinion at *14 n. 66.

. App. to Answering Br. at 1189 (Fasman Email).

. Id. at 1195.

.SIGA also argues that the Court of Chancery "selectively and arbitrarily” considered the post-breach evidence, and supposedly "ignored” post-breach evidence that proved damages were speculative or should have been far less than awarded. Opening Br. at 35. The weighing of pertinent evidence, is within the discretion of the trial court, and will not be second-guessed on appeal. See Gatz, 59 A.3d at 1212; Bank of N.Y. Mellon Trust Co., 29 A.3d at 236; Hudak v. Procek, 806 A.2d 140, 150 (Del. 2002) ("The weight to be given to evidence ... -is for the trier of fact to determine.”).'

. 2011 Opinion at *38 (emphasis added).

. Id.

.Remand Order at *2 (“SIGA-shall serve on PharmAthene any objections to the revised calculations within ten days of receiving ... the calculations.... The scope of these objections shall be limited to computational errors-") (emphasis in original).

. App. to Answering Br. at 1468 (Baliban’s Report).

. Letter Opinion at *1-2,

. App. to Answering Br. at 1200.

. Id. at 1189 (Fasman Email).

. Id. at 1195.

. Id. at 1204 n.l (Letter from Goch to Ol-stein).

. Id. at 808 (Email from Hruby to Kona-tich); id. at 1135 (Email from Hruby to Drap-kin).

. App. to Answering Br. at 1135 ("1 presented to both DHS and DOD last week. They were very ‘impressed’ and indicated acquisitions in the future.”).

. Id. at 811 (SIGAPress Release).'

. 'Id. at 1135.

. SIGA I at 338.

. Remand Opinion at *5 n. 29.

. The Court of Chancery crafted a remedy earlier in the case that was designed to eliminate uncertainty even more, by tying relief to a stream of royalties derived from sales. This Court in SIGA I never addressed whether that remedy was within Chancery's broad remedial discretion, and the dissent does not explain why that original remedy was incorrect.

.See Gannett Co., Inc. v. Kanaga, 750 A.2d 1174, 1181 (Del. 2000) (“there must be some closure to matters already decided in a given case by the highest court of a particular jurisdiction, particularly when (with a different composition of jurists) that same court is considering matters in a later phase of the same litigation.”).

. PharmAthene, Inc. v. SIGA Techs., Inc., 2011 WL 4390726, at *37 (Del. Ch. Sept. 22, 2011) [hereinafter, "PharmAthene I, 2011 WL 4390726, at-”].