# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-11192

United States Court of Appeals
Fifth Circuit

**FILED**

January 7, 2020

Lyle W. Cayce
Clerk

SOARING WIND ENERGY, L.L.C.; TANG ENERGY GROUP, LIMITED;
THE NOLAN GROUP INCORPORATED; MITCHELL W. CARTER;
JAN FAMILY INTERESTS, LIMITED;
MARY M. YOUNG, Individually and as the Independent Executrix
of the Estate of Keith P. Young, Jr., Deceased,

Plaintiffs–Appellees,

versus

CATIC USA INCORPORATED,
Also Known as AVIC International USA, Incorporated;
AVIC INTERNATIONAL HOLDING CORPORATION;
AVIC INTERNATIONAL RENEWABLE ENERGY CORPORATION;
AVIATION INDUSTRY CORPORATION OF CHINA;
CHINA AVIATION INDUSTRY GENERAL AIRCRAFT COMPANY
LIMITED,

Defendants–Appellants.

Appeals from the United States District Court
for the Northern District of Texas

No. 18-11192

Before DAVIS, SMITH, and COSTA, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Catic USA,[1] a California corporation with Chinese corporate parentage, appeals the confirmation of an adverse arbitral award. Having determined that this court has jurisdiction, we affirm: The arbitration panel was fairly constituted and did not exceed its authority.

I.

A dispute among members of Soaring Wind Energy, LLC (sometimes called "the LLC"), was submitted to an arbitration panel, which awarded the LLC $62.9 million against Catic USA (and its AVIC-group affiliates) and ordered that Catic USA be divested of its shares in the LLC without compensation. A judgment of the district court confirmed that award. Catic USA, joined by its various Chinese affiliates, appeals.

The origins of Soaring Wind Energy trace to 2007, when representatives of Tang Energy Group ("Tang Energy") and Catic USA began talks of creating a vehicle for wind-energy marketing and project development. They confirmed those talks in a Memorandum of Understanding, which the Soaring Wind Agreement (the "Agreement") superseded.

The Agreement created the LLC, whose "business" would be "to provide worldwide marketing of wind energy equipment, services and materials related to wind energy, including, but not limited to, marketing wind turbine generator blades and wind turbine generators and developing wind farms." Each member agreed to "conduct activities constituting the Business [only] in and through [Soaring Wind] and its Controlled subsidiaries." Class A

---

[1] Catic USA is also known as AVIC International USA.

No. 18-11192

members agreed that such prohibition extended to their affiliates.

The Agreement also outlined a procedure for resolving disputes. Under its terms, "any controversy, dispute, or claim arising under or related to [the Agreement]," after failed attempts at negotiation, "shall be submitted to binding arbitration." Each "Disputing Member"—defined as "each Member that is a party to [the] Dispute"—would then have the opportunity to name its own arbitrator. Those selected as arbitrators would themselves choose an additional arbitrator (or two additional arbitrators if necessary to achieve an odd number). The panel would have the authority "to grant injunctive relief and enforce specific performance" and to issue a final, court-enforceable decision, though it would lack "authority to award special, exemplary, punitive or consequential damages."

After years without Catic USA's providing Soaring Wind any financial support, a representative from Tang Energy requested that one of Catic USA's Chinese AVIC-group affiliates[2] help fund Soaring Wind. An AVIC representative responded that "AVIC International has already provided a total of 50 million USD in financing to wind power projects in the US and will keep[] trying in the future." Paul Thompson—himself a Class B member of Soaring Wind—served as president and CEO of one such affiliate,[3] through which the AVIC group appeared to have invested millions of dollars in wind power project development.[4]

---

[2] Two years after Catic USA signed the Agreement, its parent company formed AVIC International Renewable Energy Corporation ("AVIC IRE") as a majority-owned subsidiary. AVIC IRE's stated purpose, like Soaring Wind's, included developing wind power projects.

[3] Thompson ran Ascendant Renewable Energy Corporation ("Ascendant"), which itself funded at least one major wind farm project to completion between 2011 and 2012. Ascendant was formed as a wholly owned subsidiary of AVIC IRE.

[4] The arbitration panel found that AVIC IRE or its subsidiaries had developed at least five wind turbine projects in the United States, with additional projects located abroad.

## No. 18-11192

Tang Energy subsequently demanded arbitration against Catic USA, Thompson, and Catic USA's non-signatory corporate affiliates. Among other things, Tang claimed that Catic USA had breached the Agreement through the actions of its Chinese corporate affiliates. Tang named its arbitrator in its demand, and the four remaining Class A members[5] joined Tang in the dispute and, accordingly, named their respective arbitrators. Catic USA and Thompson answered Tang's demand and named their own arbitrators, but Catic USA's non-signatory Chinese affiliates refused to participate in the arbitration. As the Agreement required, the seven selected arbitrators then collectively appointed two more.

Catic USA and Thompson preemptively sued the claimants in federal court, seeking a declaratory judgment that the panel was improperly constituted.[6] Specifically, they claimed both that fundamental fairness and the Agreement required each side of the dispute to select an arbitrator, who would then select a third and final arbitrator. The district court dismissed those claims for lack of subject matter jurisdiction under the FAA.[7] Catic USA and Thompson made similar arguments before the arbitration panel, which determined for itself that it was constituted according to the Agreement's unambiguous terms.

After a five-day hearing, the arbitration panel issued its final award in favor of the claimants. The panel determined that "Catic USA breached the

---

[5] Appellees Young, Carter, Jan Family Interests, and the Nolan Group.

[6] One of Catic USA's non-signatory affiliates also preemptively sued the claimants, successfully obtaining a judgment declaring that its "party status to the arbitration [could] only be determined by a court, and not an arbitrator . . . ." *Ascendant Renewable Energy Corp. v. Tang Energy Grp., Ltd.*, No. 3:14-CV-3314-K, 2015 U.S. Dist. LEXIS 103518, at *8 (N.D. Tex. Aug. 4, 2015).

[7] *AVIC Int'l USA, Inc. v. Tang Energy Grp., Ltd.*, No. 3:14-CV-2815-K, 2015 U.S. Dist. LEXIS 13968 (N.D. Tex. Feb. 5, 2015), *aff'd*, 614 F. App'x 218 (5th Cir. 2015) (per curiam).

[Soaring Wind] Agreement by its Affiliates engaging in the 'Business' of [Soaring Wind Energy]." It further found that the AVIC group, including Catic USA, "operate[d] as one entity" and that "AVIC HQ and its wholly owned subsidiaries created additional subsidiaries in an attempt to get around its promises made in the [Soaring Wind] Agreement to Claimants." The panel concluded that Catic USA and its non-signatory Chinese affiliates should be held "jointly and severally liable to [Soaring Wind] in the amount of $62.9 USD million" in lost profits owed to the LLC.[8]

The arbitration panel noted that "[t]he lost profits set forth in [its] award are due to [Soaring Wind Energy] for distribution to the Claimants through their percentages set forth in the [Soaring Wind] Agreement." The panel did not, however, stop at ordering that Catic USA pay the monetary damages: "[I]n order to prevent [Catic] USA and Thompson from profiting from their breaches of the [ ] Agreement," the panel wrote, "they should be prohibited from receiving any profit from any award to [Soaring Wind]." Thus, in addition to the $62.9 million damages, the panel ordered that "[Catic] USA and Thompson's equity interest in [Soaring Wind] should be divested . . . ."[9]

The claimants sought judicial confirmation of the arbitral award against Catic USA and its Chinese affiliates. At the claimants' request, the district court bifurcated the proceedings, staying the case against the Chinese entities.[10] The court then confirmed the award in its entirety against Catic USA.

---

[8] The panel arrived at that amount by accepting AVIC IRE's vice president's admission that the AVIC group had invested $50 million in wind power projects in the United States. At an anticipated 15% rate of return, the discounted present value of the $50 million investment was $62.9 million.

[9] The panel allowed Catic USA a $350,000 credit for its initial capital contribution to Soaring Wind.

[10] That case, relating most importantly to the Chinese entities' joint and several liability for Catic USA's damages, remains stayed pending the resolution of this appeal.

No. 18-11192

Catic USA and its Chinese affiliates appeal.

## II.

"[C]ourts, including this Court, have an independent obligation to determine whether subject-matter jurisdiction exists . . . ." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Accordingly, we requested *nostra sponte* that the parties address federal subject-matter jurisdiction under either complete diversity or the New York Convention ("NY Convention").[11]

The parties vainly try to taint each other's assertions with those made in the district court. Catic USA notes that "diversity jurisdiction," not jurisdiction under the NY Convention, "is the only basis for jurisdiction" that the plaintiffs had invoked. Similarly, the plaintiffs highlight that, although Catic USA contends that jurisdiction is lacking on appeal, it invoked the NY Convention when seeking declaratory judgment before arbitration. Those points are irrelevant, as "[i]t is well settled . . . that the subject matter jurisdiction of a federal court can be challenged at any stage of the litigation (including for the first time on appeal), even by the party who first invoked it." *Randall & Blake, Inc. v. Evans* (*In re Canion*), 196 F.3d 579, 585 (5th Cir. 1999).

Attempting to sidestep that maxim, the plaintiffs characterize jurisdiction under the NY Convention—here, whether a legal relationship bears a "reasonable relation" to a foreign state—as a "jurisdictional fact" capable of party admission. But what should amount to a "reasonable relation" under 9 U.S.C. § 202 is patently a question of law, not of fact. Catic USA could certainly admit facts—such as the existence of its Chinese affiliates or of projects Soaring Wind contemplated abroad—and those binding facts might be decisive

---

[11] "The Convention on the Recognition and Enforcement of Foreign Arbitral Awards," 9 U.S.C. §§ 201 *et seq.*

No. 18-11192

in a jurisdictional inquiry. *See State Farm Fire & Cas. Co. v. Flowers*, 854 F.3d 842, 845 (5th Cir. 2017). A party is not, however, bound by its previous legal arguments as to jurisdiction. *See Canion*, 196 F.3d at 585.

The district court did not address whether there is complete diversity, but it appears to have assumed, without explanation, the applicability of the NY Convention. We examine *de novo* the presence of federal subject-matter jurisdiction, *Pershing, LLC v. Kiebach*, 819 F.3d 179, 181 (5th Cir. 2016), keeping in mind that its absence would require dismissal, *Arbaugh*, 546 U.S. at 506.

A.

For the district court to have diversity jurisdiction under 28 U.S.C. § 1332, "all persons on one side of the controversy [must] be citizens of different states than all persons on the other side" at the time the complaint was filed. *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1079 (5th Cir. 2008). Catic USA is a California corporation. It is undisputed that, as of the initiation of the arbitration, Catic USA was a member of Soaring Wind, LLC, and because, for diversity jurisdictional purposes, "the citizenship of a LLC is determined by the citizenship of all of its members," *id*. at 1080, Soaring Wind was at least at that point a citizen of California.

The arbitration panel purported to divest Catic USA of its membership interest in Soaring Wind. The question is whether that decision alone—absent subsequent judicial confirmation—effected Catic USA's termination from Soaring Wind and, consequently, Soaring Wind's loss of California citizenship. If not, this court would lack diversity jurisdiction.

Catic USA contends that diversity jurisdiction is lacking because the arbitral award divesting it of its membership in Soaring Wind had no legal effect pending court confirmation. The plaintiffs respond that, under the

freedom of contract recognized under Delaware law, the Agreement must be interpreted as granting the arbitration panel "final, binding" authority to terminate Catic USA's membership in the LLC.

Plaintiffs' focus on Delaware's freedom of contract misses the point. The question is not whether the Agreement granted the arbitration panel authority to issue an award divesting Catic USA of membership. Even assuming the panel did have such authority, it is an entirely separate question whether the panel's decision had immediate legal effect.

It did not. It is well settled that, absent voluntary compliance, an arbitral award requires judicial confirmation to effect a change in legal status.[12] Plaintiffs' attempt to characterize the "final, binding" authority of the panel as including coercive legal authority is unpersuasive. Such commonly used terms "merely reflect a contractual intent that the issues joined and resolved in the arbitration may not be tried de novo in any court." *M & C Corp. v. Erwin Behr GmbH & Co.*, 87 F.3d 844, 847 (6th Cir. 1996). They do not grant arbitrators "the coercive power to enforce the award" without being first "transformed into a judgment, which can be executed with the enforcement mechanism of the state." *Schlumberger*, 195 F.3d at 220. That an arbitral award be "final" does not obviate the need for judicial confirmation; it only *allows* for such confirmation.[13]

Granted, parties may contract to change membership in an LLC without

---

[12] *Schlumberger Tech. Corp. v. United States*, 195 F.3d 216, 220 (5th Cir. 1999); *see also Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1293 (11th Cir. 2010); *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006); *Suter v. Munich Reins. Co.*, 223 F.3d 150, 156 (3d Cir. 2000); *Camping Constr. Co. v. Dist. Council of Iron Workers*, 915 F.2d 1333, 1347–48 (9th Cir. 1990).

[13] *See Grissom v. Nationwide Mut. Ins. Co.*, 599 A.2d 1086, 1090 (Del. Ch. 1991) ("The general rule is that an Arbitration Award may be confirmed only if it is a final decision.").

No. 18-11192

court approval. It is entirely different, however, when parties seek an *involuntary* termination of membership. Plaintiffs acknowledge that "a judgment would be needed, for example, to enforce a damages award by levying the judgment debtor's assets." But equity interest in an LLC is also an asset, an involuntary transfer of which no arbitrator may effect without judicial confirmation.

The plaintiffs are correct that the Agreement does not mandate judicial review of arbitration awards. Indeed, it specifies that an arbitral award "*may* be filed in any court of competent jurisdiction and *may* be enforced by any Disputing Member as a final judgment of such court." But the "optional" nature of judicial review here does not mean, as plaintiffs contend, that the arbitral award has inherent legal effect. Instead, judicial confirmation would be unnecessary (or "optional") should all parties *voluntarily* acquiesce to the award. Catic USA has not done so, which is precisely why plaintiffs seek judicial confirmation.

B.

Even without diversity of citizenship, this court would have jurisdiction should this case relate to an arbitration agreement or award "falling under" the NY Convention.[14] It is undisputed that the action to confirm the award "relates to" the award; the question is whether that award "falls under" the Convention. An "arbitral award arising out of a legal relationship" between U.S. citizens falls under the Convention if that "relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states."[15]

---

[14] 9 U.S.C. § 203; *see also Stemcor USA Inc. v. CIA Siderurgica do Para Cosipar*, 927 F.3d 906, 909 (5th Cir. 2019) (on pet. for reh'g).

[15] 9 U.S.C. § 202; *see also Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327,

No. 18-11192

Catic USA contends that the Agreement does not involve property abroad and does not reasonably relate to a foreign state. Catic USA suggests that this court remand with instruction to determine whether its non-signatory Chinese corporate affiliates were party to the Agreement and whether the agreement contemplated performance abroad. If the answer to both questions be no, then there would be no subject matter jurisdiction.

The plaintiffs respond that the Agreement has a reasonable relation to China. They note that Catic USA is a subsidiary of AVIC IHC, which is itself a subsidiary of AVIC HQ—a state-owned enterprise of the People's Republic of China. They further note the arbitrators' finding that "AVIC HQ exercised such complete control" over Catic USA so that the two companies "operate[d] as one entity," and "[w]hen [Catic] USA signed the [Soaring Wind] Agreement, it was doing so on orders from AVIC HQ." According to the plaintiffs, "the Chinese entities'—and Chinese state's—involvement pervaded the parties' relationship," conferring jurisdiction under the Convention.

There is no question that the relationship among the parties broadly relates to China. Tang Energy had partnered with AVIC HQ[16] on projects within Chinese territory from 1997 through the mid-2000s. The success of those projects inspired them to create Soaring Wind, conceived as a partnership between Tang and AVIC HQ's U.S. subsidiary. The pre-Agreement Memorandum of Understanding envisioned that 9.5% of Soaring Wind's equity would be owned by AVIC HQ, whose "offices and employees in China [would] be available for support as needed."[17] An AVIC HQ vice president—who held

---

339–40 (5th Cir. 2004).

[16] At the time, the Chinese umbrella AVIC organization was known as "Catic."

[17] The eventual Agreement differed from the Memorandum of Understanding by not mentioning Catic International and by increasing Catic USA's profit interest.

no position in Catic USA—signed that Memorandum on Catic USA's behalf. Following the creation of Soaring Wind, Tang contracted separately with one of Catic USA's Chinese affiliates to obtain $300 million in financing for wind power project development. Plaintiffs are thus correct in stating that "[a]lthough only United States citizens signed the Soaring Wind Agreement, the parties' relationship both (i) involved Chinese citizens, including arms of the Chinese government, and (ii) had a reasonable relation to China."

The statute, however, concerns not the "parties' relationship" but the "legal relationship" whence the arbitral award arose. 9 U.S.C. § 202. That legal relationship is the Agreement, which plaintiffs accuse Catic USA of violating and which provided the basis for the underlying arbitration. We look, therefore, not to the general relationship among the parties but to the foreign character, if any, of the Agreement itself.

It is not dispositive that Catic USA, as signatory to the Agreement, is a subsidiary of a Chinese corporate umbrella. Congress has not granted federal jurisdiction whensoever there exist a legal relationship bearing any reasonable relation with a foreign state; more precisely, it has specified there be "*some other* reasonable relation" with a foreign state. *Id.* (emphasis added). The "reasonable relation" is thus limited[18]; it must be akin to "involv[ing] property located abroad" or "envisag[ing] performance or enforcement abroad"—that is, the relationship must contemplate overseas action or involvement. *See id.*; *see also Yates v. United States*, 135 S. Ct. 1074, 1086–87 (2015) (plurality opinion) (discussing the textual canon of *ejusdem generis*). It might be enough if an agreement "call[] . . . for meetings to be held in" a foreign country or if it should

---

[18] "[W]here general words follow specific words in an enumeration . . , the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding words." William N. Eskridge, Jr., INTERPRETING LAW 77 (2016) (quoting 2A SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 47:17 (7th ed. 2015)).

"contain a list of mandatory [foreign] vendors . . . ."[19]  It is not enough, however, that one party, though a U.S. citizen, should happen to bear foreign corporate parentage.[20]

The Agreement makes explicit reference neither to China nor to any Chinese citizen, nor even to any foreign place or entity.[21]  Aside from a generic, stated purpose "to provide worldwide marketing" in wind energy, the Agreement appears to evince a domestic character:  It creates a Delaware company, comprised entirely of U.S. citizen-members, with a principal place of business in Texas.  As per the Agreement, the underlying arbitration proceeded in Texas, under Delaware substantive law.  In short, it would appear on its face that the Agreement bears no relation to China (or any other foreign state).

Our analysis of the Agreement's relation to a foreign state does not, however, end at the four corners of the contract.[22]  The Agreement specifies that a member would be in breach should its "[a]ffiliate[] . . . participate in wind farm land development projects . . . except through an entity owned by both [Soaring Wind Energy] and CATIC . . . ."  Such "affiliates" of Catic USA include a variety of Chinese entities, a fact of which the contracting parties

---

[19] *Outokumpu Stainless USA LLC v. Converteam SAS*, No. 16-00378-KD-C, 2017 U.S. Dist. LEXIS 11995, at *16 (S.D. Ala. Jan. 30, 2017), *aff'd in relevant part*, 902 F.3d 1316 (11th Cir. 2018), *cert. granted*, 139 S. Ct. 2776 (2019).

[20] *See Access Info. Mgmt. of Haw., LLC v. Shred-It Am., Inc.*, No. 10-00622, 2010 U.S. Dist. LEXIS 116862, at *17 (D. Haw. Nov. 2, 2010) ("[I]t is irrelevant to the inquiry that [the defendant] is a wholly-owned subsidiary of a [foreign] corporation . . . ."); *Williams v. Deutsche Bank AG*, No. 3:05-CV-1395-N, 2006 U.S. Dist. LEXIS 75426, at *13 (N.D. Tex. Feb. 9, 2006) ("[T]hat a domestic signatory of the agreement is a subsidiary of a foreign corporation . . . does not give the arbitration agreement a 'reasonable relation' with a foreign state.").

[21] The contract's "Definitions" section specifies that "CATIC" refers to "CATIC (USA), a California corporation."

[22] *See, e.g., ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 890 F. Supp. 2d 912, 927 (N.D. Ill. 2012) (looking to the foreign "nature" of the business); *Nomanbhoy v. Vahanvaty*, No. 11-C-2456, 2011 U.S. Dist. LEXIS 147033, at *25–26 (N.D. Ill. Dec. 21, 2011) (evaluating extracontractual testimony to determine whether the parties envisaged performance abroad).

No. 18-11192

were well aware.  A Chinese entity's actions on foreign soil could (and did) trigger breach for one of the LLC's (domestic) members.  Moreover, the arbitral award holds those Chinese affiliates jointly and severally liable for damages to the claimants.  Such factors are enough for the Agreement to bear a relation to China sufficient for federal jurisdiction under the NY Convention.

## III.

"We review a district court's order confirming an arbitration award de novo [and] may affirm the district court's decision on any basis presented to the district court and argued in the district court."  *Light-Age, Inc. v. Ashcroft-Smith*, 922 F.3d 320, 322 (5th Cir. 2009) (per curiam).  Despite that, "our review of the arbitrator's award itself . . . is very deferential."  *Timegate Studios, Inc. v. Southpeak Interactive, LLC*, 713 F.3d 797, 802 (5th Cir. 2013).  Indeed, this court may vacate the award only if "the arbitrators exceeded their powers"[23] by acting "contrary to express contractual provisions"[24] or if the award otherwise violates the NY Convention.[25]  Even then, appellants face a heavy burden, as "[a] reviewing court examining whether arbitrators exceeded their powers must resolve all doubts in favor of arbitration."  *Rain CII Carbon, LLC v. ConocoPhillips Co.*, 674 F.3d 469, 472 (5th Cir. 2012).

Seeking to vacate the award, Catic USA and its Chinese affiliates advance three theories:  (1) The district court erred by confirming the award without first reviewing the arbitrators' power over Catic USA's Chinese affiliates; (2) the arbitration panel was improperly constituted; and (3) the award includes speculative or punitive damages rendering it unenforceable.

---

[23] 9 U.S.C. § 10(a)(4).

[24] *Beaird Indus., Inc. v. Local 2297, Int'l Union*, 404 F.3d 942, 946 (5th Cir. 2005).

[25] *See* 9 U.S.C. § 207.

No. 18-11192

A.

Catic USA suggests that the district court could not have confirmed the arbitral award without first determining that the company's Chinese affiliates were subject to arbitration. It notes that the arbitration panel first found the affiliates to be subject to arbitration, then drew an adverse inference from their refusal to participate. Without that inference, Catic USA contends, the arbitrators had no basis for finding breach.

The panel's inference that one or more of Catic USA's affiliates financed a wind power development project in violation of the Agreement was based on more than the affiliates' non-participation in the arbitration. First, the panel had access to AVIC IRE Vice President Xu Hang's e-mail that "AVIC International [had] already provided a total of $50 million USD in financing to wind power projects in the US," none of which had flowed to Soaring Wind. Second, the AVIC Group's press releases and online publications referenced ongoing (non-Soaring Wind) wind-power development projects. Catic USA failed to provide any meaningful rebuttal to such evidence.

Catic USA made its proverbial bed; therein it must lie. The company signed an agreement specifying that the actions of its affiliates could constitute its own breach. Whether Catic USA's non-signatory affiliates themselves be subject to the arbitration is irrelevant: Catic USA "assum[ed] the obligation of its affiliates' performance."[26] The arbitration panel reasonably found that a breach had occurred; given the deference owed to the panel,[27] we decline to

---

[26] *Xtria LLC v. Tracking Sys., Inc.*, No. 3:07-CV-0160-D, 2007 U.S. Dist. LEXIS 68997, at *10 (N.D. Tex. Sept. 18, 2007).

[27] Catic USA attempts to frame the issue as akin to whether its Chinese affiliates were subject to the Agreement, a question undisputedly outside the traditional deference given to arbitrators. *See Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 354 (5th Cir. 2003). But the answer to that question is immaterial to the issue at hand, which is whether conduct occurred triggering Catic USA's breach. That "is a question of fact," *Tex. Capital Bank N.A.*

14

No. 18-11192

disturb that finding.

## B.

Catic USA claims that the panel was improperly constituted.  It notes that one side (the plaintiffs) appointed five arbitrators, the other side (Catic USA and Thompson) only two.  That method of selection was against the terms of the contract, which, according to Catic USA, required an equal number of appointed arbitrators per side.  Because the panel was improperly selected, Catic USA contends, this court owes no deference to its award.

In addition, Catic USA's Chinese affiliates contend that—even assuming the Agreement's process of appointing arbitrators were followed—the result nevertheless violated the NY Convention's due process and public policy requirements.  They aver that it was fundamentally unfair (and therefore invalid under the Convention) for one side to appoint more than twice as many arbitrators as the other.  As this court must observe "the [Convention's] grounds for refusal . . . of recognition or enforcement of the award," 9 U.S.C. § 207, the Chinese companies suggest we set the award aside.

## 1.

The Federal Arbitration Act requires that "[i]f in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed . . . ."  *Id.* § 5.  Arbitrators appointed contrary to the contract necessarily "exceed[] their powers," *id.* § 10(a)(4), and, in such a case, "judicial deference is at an end," *PoolRe Ins. Corp. v. Org. Strategies, Inc.*, 783 F.3d 256, 262 (5th Cir. 2015).  Catic USA is thus correct that, should the selection of the arbitration panel fundamentally

---

*v. Dall. Roadster, Ltd.* (*In re Dall. Roadster, Ltd.*), 846 F.3d 112, 127 (5th Cir. 2017), the resolution of which we generally leave to the arbitrators.

"depart[] from the contractual selection process," vacatur would be the appropriate remedy. *Id*. at 263.

There was no such departure. Catic USA notes "that there were only two sides in this dispute," but the Agreement contemplates the number of *parties*, not the number of sides. The Agreement lists seven total, signatory "Members."[28] For a dispute under the Agreement, "each Member that is a party to such Dispute is . . . a 'Disputing Member.'" And each Disputing Member would have the opportunity to "name an Arbitrator (or otherwise agree in writing to the Arbitrator(s) therefore chosen as its designated arbitrator)." This case involves two sides, but, more importantly, it features seven members; suppose Eris had tossed the Apple of Discord into a Soaring Wind conference room, prompting a free-for-all among the parties—the arbiter selection process would have remained the same.

This court already noted that "AVIC [was] asking us to rewrite their agreement's arbitration provision to require that every arbitration among these multiple parties comprise only two 'sides' . . . [and] precisely three arbitrators . . . ." *AVIC Int'l*, 614 F. App'x at 219. Catic USA has since clarified that its proffered reading allows for more than two "sides" to a dispute (and more than three arbitrators) but nevertheless requires each "side" have equal say in arbitrator selection. But as stated above, the Agreement contemplates the number of parties, not the number of sides. Given that Catic USA does not (and cannot) seriously question that each Claimant is "a party to [the] Dispute," it cannot escape the conclusion that the Agreement's written procedure was followed.

---

[28] CATIC (USA), also known as AVIC USA; Tang Energy Group, Ltd.; Keith P. Young; Mitchell W. Carter; Jan Family Interests, Ltd.; The Nolan Group, Inc.; Paul E. Thompson.

No. 18-11192

Catic USA would therefore have us hold that following the text of the Agreement in this case leads to "absurd results." Under the Agreement, Catic USA posits, "ten minority shareholders . . . could unite together to eject a majority shareholder that controls 90% of the LLC from membership . . . [by] appointing ten of the eleven arbitrators to rubber-stamp its coup." As in this case, Catic USA submits, "the formation of a stacked, unfair arbitration panel is an absurd result to which no reasonable party would ever agree."

But the risk of such an occurrence is precisely within the plain terms to which Catic USA agreed. Catic USA urges this court not to choose from among competing, reasonable interpretations but to discard the plain text of the Agreement out of so-called fairness. "It is not the court's role to rewrite the contract between sophisticated market participants, allocating the risk of an agreement after the fact, to suit the court's sense of equity or fairness."[29] One must assume that Catic USA did not expect to be outnumbered in any dispute falling under the Agreement; that its expectations were frustrated does not render the Agreement absurd or unfair.

2.

Federal courts are to enforce the NY Convention.[30] Its Article V(1)(b) provides that a court may refuse to recognize or enforce an award where "[t]he party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was other-wise unable to present his case . . . ." This court has construed that passage as "essentially sanction[ing] the application of the forum state's standards of due

---

[29] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 624 (Del. Ch. 2005), *rev'd in part on other grounds*, 901 A.2d 106 (Del. 2006).

[30] 9 U.S.C. § 201; *see also* Recognition and Enforcement of Foreign Arbitral Awards, Dec. 29, 1970, 21 U.S.T. 2517.

process, in this case, United States standards of due process." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 298 (5th Cir. 2004) (quotation marks omitted). The hearing must "meet[] the minimal requirements of fairness—adequate notice, a hearing on the evidence, and an impartial decision by the arbitrator" once the parties have had "an opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 299 (quotation marks omitted).

Catic USA's Chinese affiliates claim that the arbitration proceedings violated due process, reasoning that because the two sides appointed an unequal number of arbitrators, the panel's decision could not have been impartial. That contention, when taken to its logical conclusion, would require this court to invalidate any arbitral award not issued by an evenly appointed panel.

We reject that notion. The Agreement was not a contract of adhesion but a bespoke deal made between extremely sophisticated parties. The Agreement did not inherently favor one party or another; it just so happened that Catic USA was outnumbered. The agreed-upon selection process was followed to the letter: Catic USA and Thompson selected the arbitrators and received the process they were due.

## C.

Catic USA contends that, even assuming the panel was properly constituted, the award is improper. Specifically, Catic USA claims that the panel exceeded its authority by awarding speculative and punitive damages in violation of the Agreement's written terms. Catic USA notes that the Agreement expressly foreclosed any liability among members or affiliates for "exemplary, punitive, special, indirect, consequential, remote, or speculative damages," and the Agreement denied any arbitrator the power to award such damages. Catic USA contends (1) that the panel's estimation of lost profits was speculative and

No. 18-11192

(2) that by divesting Catic USA of its LLC membership interest yet holding it liable for the LLC's total estimated lost profits, the award was punitive. Catic USA suggests that, because the award reflects an abuse of the panel's authority, this court vacate and remand for further proceedings.

An "arbitral action contrary to express contractual provisions will not be respected on judicial review." *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1325 (5th Cir. 1994) (quotation marks omitted). The Agreement explicitly stated that "[t]he Arbitrators shall have no authority to award special, exemplary, punitive or consequential damages." Thus, the contract itself "limited the arbitrator's own authority." *Timegate*, 713 F.3d at 805 n.17. We generally defer to arbitrators' interpretation of their own authority, *see Rain*, 674 F.3d at 472, but if the panel exceeded its authority, "it would be incumbent upon us to vacate [the] award, in spite of the discretion typically granted to arbitral decisions," *Bridas*, 345 F.3d at 365.

1.

"[T]he standard remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante*." *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1130 (Del. 2015). Such damages "must be proven with reasonable certainty, and no recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative." *Id.* at 1131 (quotation marks omitted). At the same time, "certain presumptions apply when evaluating harm and loss. Where the injured party has proven the *fact* of damages . . , less certainty is required of the proof establishing the *amount* of damages." *Id.* (emphases in original). Thus, "[r]esponsible estimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages." *Del. Express Shuttle, Inc. v. Older*, No. 19596, 2002 Del. Ch. LEXIS 124, at *60 (Del. Ch. Oct. 23, 2002). And on

the margins, it is an "established presumption that doubts about the extent of damages are generally resolved against the breaching party." *Siga*, 132 A.3d at 1131.

The award is based on much more than speculation. Having found that Catic USA breached the agreement by investing (via an affiliate) at least $50 million in wind-farm development in an outside entity, the arbitration panel was tasked with estimating claimants' resulting lost profits, if any. The panel found that Catic USA's affiliated AVIC group would invest in any given project only if it anticipated a minimum 15% return; it then discounted that return to determine the present value of the lost profits.

Catic USA does not contest that AVIC's anticipated rate of return was 15% or that the panel employed an appropriate discount rate; instead, it attacks the panel's assumption that AVIC's investment did (or would) generate profits. It is true that, although the amount of lost profits may be estimated, claimants generally "must show that there would [have been] *some* future profits" but for the breach. *Id.* at 1133 (emphasis added). But in this case, Catic USA has refused to provide the relevant information, and it was thus within the arbitration panel's authority to infer that AVIC's investment was indeed profitable. *See id.* at 1131 n.132 (noting that damages may be inferred when uncertainty results from the breaching party's own actions).

2.

"Historically, damages for breach of contract have been limited to the non-breaching parties' expectation interest." *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 445 (Del. 1996). "Punitive damages . . . increase the amount of damages in excess of the promisee's expectation interest . . . ." *Id.* at 446. The Agreement explicitly denied arbitrators the authority to award punitive damages. "Thus, if punitive damages were indeed awarded in this

No. 18-11192

case, it would be incumbent upon us to vacate such an award, in spite of the discretion typically granted to arbitral decisions." *Bridas*, 345 F.3d at 365.

Catic USA contends that the panel issued what are effectively punitive damages. Given the panel's determination that Catic USA's breach denied Soaring Wind $62.9 million in lost profits, claimants would be owed expectation damages of $31.45 million to reflect their 50% interest in the company. But by awarding the full $62.9 million while simultaneously divesting Catic USA and Thompson of their equity interest, Catic USA suggests, the panel granted the claimants what is, in substance, double their expected damages.

The panel acknowledged that "[t]he lost profits set forth in [its] award are due to [Soaring Wind] for distribution to the Claimants through their percentages set forth in the [ ] Agreement." Insofar as it divested Catic USA and Thompson of their equity interests, the award served not necessarily to compensate the claimants or the LLC but "to prevent [Catic] USA and Thompson from profiting from their breaches."

Although the panel did not have the authority to issue punitive damages, it did possess powers to grant court-enforceable injunctive relief. The question thus is whether the divestment constitutes permissible injunctive (or equitable) relief or improper punitive damages.

It is the former. The panel divested Catic USA and Thompson of their interest in Soaring Wind to prevent them from receiving incidental benefit for breaching their duties, duties owed not only to the other members of the LLC but also to the LLC itself. Unlike punitive damages, which are based on a perceived reprehensibility of the breaching party's actions or flow from a desire to make examples of them, *see E.I. DuPont*, 679 A.2d at 445–46, the divestment operates to achieve what the panel considered a fair result. Such concern— that relief not only compensate parties financially but also achieve a just

21

outcome, *ex aequo et bono*—is precisely a matter of equity.[31]　Catic USA's theory that the divestment effectively doubles the damages—and is therefore substantively indistinguishable from punitive damages—is well taken, but, given the broad scope of "equitable" relief,[32] combined with the deference we must grant the arbitration panel,[33] we decline to set aside the divestment as punitive and not equitable.

The judgment confirming the arbitration award is AFFIRMED.

---

[31] *See* 1 J. POMEROY, EQUITY JURISPRUDENCE § 363, at 8–9 (5th ed. 1941).

[32] *See Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212–18 (2002).

[33] *See Rain*, 674 F.3d at 472.