**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

CONCERNED CITIZENS OF THE ) 
ESTATES OF FAIRWAY VILLAGE, ) 
an unincorporated association, ) 
JULIUS H. SOLOMON and PEGGY A. ) 
SOLOMON, his wife, EDWARD D. ) 
LEARY and LISA P. TORRINI ) 
LEARY, his wife, KENNETH P. ) 
SMITH and DENISE M. SMITH, his ) 
wife, and TERRY L. THORNES and ) 
CARMELA M. THORNES, his wife, ) 
) 
          Plaintiffs, ) 
) 
       v. )    **C.A. No. 2017-0924-JRS** 
) 
FAIRWAY CAP, LLC and FAIRWAY ) 
VILLAGE CONSTRUCTION, INC., ) 
) 
          Defendants. ) 

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
POST-TRIAL MOTION FOR AN AWARD OF COSTS AND/OR
CONSEQUENTIAL DAMAGES SUFFERED BECAUSE OF THE
PRELIMINARY INJUNCTION**

WHEREAS, Defendants, Fairway Cap, LLC and Fairway Village

Construction, Inc., have brought a Post-Trial Motion for an Award of Costs and

Consequential Damages Suffered Because of the Preliminary Injunction

(the "Motion") (D.I. 159);

WHEREAS, the Motion has been fully briefed, and the Court has conducted

an evidentiary hearing and received closing arguments from counsel; and

WHEREAS, it appears to the Court that the Motion should be GRANTED in part and DENIED in part for the reasons stated below, the Court finds and decrees as follows:

1.     Plaintiff, Concerned Citizens of The Estates of Fairway Village ("Concerned Citizens"), is an unincorporated association of persons with various ownership interests in real property located in Fairway Village, a residential planned community in Sussex County, Delaware.  Plaintiffs, Julius and Peggy Solomon, Edward and Lisa Leary, Kenneth and Denise Smith and Terry and Carmela Thornes each own property in Fairway Village, and each is a member of Concerned Citizens (together the "Individual Plaintiffs").  Concerned Citizens and the Individual Plaintiffs shall be referred to collectively as "Plaintiffs."

2.     In December, 2017, Plaintiffs filed this Action seeking permanent injunctive relief against Defendants, Fairway Cap, LLC and Fairway Village Construction, Inc. (collectively "Fairway Cap").  Specifically, Plaintiffs sought to enjoin Fairway Cap from building additional residential units in Fairway Village that did not conform to the development plan in place when Plaintiffs first acquired property in the community.  According to Plaintiffs, Fairway Cap's plan to construct homes in various configurations, not for sale but for the stated purpose of maintaining a residential rental complex, was prohibited by Fairway Village's constitutive documents.

3. On January 25, 2018, Plaintiffs moved the Court to enter a preliminary injunction prohibiting Fairway Cap from renting housing units until the Court could convene a trial on the merits (D.I. 8). On March 20, 2018, I granted Plaintiffs' Motion by issuing a preliminary injunction (the "Injunction") conditioned upon Plaintiffs posting an injunction bond in the amount of ~$350,000 (D.I. 31, 42, 50). The bond was posted by a party unrelated to Plaintiffs (36 Builders, Inc., a builder of new homes within the Fairway Village community) who had brought related claims in a separate (later consolidated) action (D.I. 66, 89).

4. When 36 Builders settled with Fairway Cap, it requested that the Court terminate the injunction bond (D.I. 89). On August 14, 2018, I granted 36 Builder's request (D.I. 104). Plaintiffs urged the Court not to require them to post a replacement injunction bond (or at least not for the full amount of $350,000) given their limited resources (D.I. 96, 97). For its part, Fairway Cap made clear that if the Court determined not to require Plaintiffs to post a replacement bond, then Fairway Cap reserved the right to pursue damages it incurred during the period in which the Injunction remained in effect (D.I. 95). The Court ultimately determined not to require Plaintiffs to post a replacement bond.

5. Following a one-day trial, on March 6, 2019, I issued a Memorandum Opinion holding there was no legal basis to prevent Fairway Cap from renting out apartments in Fairway Village. True to its promise, on March 29, 2019, Fairway

Cap filed the instant Motion (D.I. 159). Plaintiffs filed an opposition, and on August 16, 2019, I issued a bench ruling that outlined the procedural history of this action (with an emphasis on the developments related to the injunction bond) and held that Fairway Cap could recover damages proximately caused by the wrongful Injunction (D.I. 177, 186).[1]

6. On January 23, 2020, the Court convened a hearing to receive evidence regarding Fairway Cap's damages during the Injunction period (D.I. 189). At this hearing, Fairway Cap bore the burden of proving its lost profits proximately caused by the Injunction by a preponderance of the evidence. *See Emerald Partners. v. Berlin*, 1998 WL 474195, at *2 (Del. Ch. Aug. 3, 1998) (holding that a party wrongfully enjoined may recover damages "proximately caused by the injunction"). To the extent those damages purportedly include lost profits, as Fairway Cap alleges, the Court may award that element of damages only to the extent they are not "uncertain, contingent, conjectural or speculative." *SIGA Technologies., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1130 (Del. 2015).

7. In their most basic form, "profits" are "the excess of revenues over expenditures." *Profits*, BLACK'S LAW DICTIONARY (11th ed. 2019). With this in

---

[1] I note here that Plaintiffs' position that they owe no damages for the wrongfully issued Injunction, since the Court did not require them to post an injunction bond, is preserved. For the balance of this Order, I focus on the parties' disputes regarding the amount, if any, of damages Fairway Cap proved it was entitled to recover.

mind, Fairway Cap cannot carry its evidentiary burden of proving lost profits simply by proving what its *revenues* would have been without the Injunction. Rather, it must also prove that any revenues it would have generated without the Injunction would not have been offset by costs it would have incurred had it been operating unrestrained. This is the only way to prove lost profits with reasonable certainty.[2] *See* 67A AM. JUR. 2D *Sales, Lost Profits, Generally* § 1161 (May 2020 Update) (noting that plaintiff must present proof of lost revenue and costs to carry its burden to prove lost profits).

8.     In order to clarify the particular items of damages on which they disagree, the parties submitted a helpful (and much appreciated) joint Excel chart outlining the specific line items of Fairway Cap's alleged damages (the "Chart") (D.I. 203, Ex. A). In the interests of brevity and clarity, I have structured my analysis to track the Chart by addressing the parties' disagreements from top to bottom.[3] At the outset, I note the parties are ~$114,000.00 apart. Plaintiffs' position is that Fairway Cap has proven it suffered no more than $40,772.00 in lost profits, while Fairway Cap believes it has proven lost profits of $154,805.00. (*Id.*)

---

[2] In this regard, I reject Fairway Cap's unsupported position that Plaintiffs bore some burden to prove any offsetting costs once Fairway Cap proved its lost revenues. *See* Defs.' Post-Hearing Br. in Supp. of their Post-Trial Mot. for an Award of Costs and/or Consequential Damages ("DOB") (D.I. 192) at 10. Not surprisingly, that position finds no support in our law. I say not surprisingly because any such rule would turn the burden to prove causally related damages on its head.

[3] I will not address the line items on which the parties have agreed.

9.      **Topline Revenue** – The parties' first major dispute concerns Fairway Cap's topline rental revenue that was lost during the Injunction.  Here, the parties focused on the total number of rental units available and, more importantly, on what dates those units were completed such that a Certificate of Occupancy, or "COI," was issued by the municipality.  Only after the COI(s) were issued could Fairway Cap begin to rent new units *even if* the Injunction had not been in place.  *See* Hr'g Re Defs.' Claim for Damages ("Tr.") (D.I. 199) at 42–43.

Having reviewed the evidence, I am satisfied that Fairway Cap has carried its burden of proving that, but for the Injunction, Fairway Cap could have rented out new units in Fairway Village within one month of the applicable COI's issuance, adjusted for a 15% vacancy rate.  In this regard, Anne McDonald, an employee of Fairway Cap, offered credible testimony that, under normal circumstances, Fairway Cap would have been advertising new units before the COIs were issued so that renters could have been lined up in advance (Tr. at 25, 42–44).  Under normal circumstances, units would have come online at staggered intervals—rather than all at once—which is what happened when the Injunction was lifted and new units flooded the market. *Id.*  These circumstances explain why, in reality, it took longer than one month for Fairway Cap to rent units when they offered the full batch of units at the same time.  Yet, even under these difficult market conditions, Fairway Cap was able to rent out nearly all of the 29 units available for lease at the time the

6

injunction was vacated within approximately 4.5 months. *See* JX 10 (calculating lost rent and the "# Days Vacant" for each rental unit).

This conclusion is further supported by the preliminary market assessment prepared by Real Property Research Group (JX 20 at 32) projecting that Fairway Village would have a 1.6% vacancy rate, and other evidence regarding vacancy rates for rental units offered by this same owner throughout Delaware (JX 16). Both pieces of evidence support a finding that Fairway Cap's 15% vacancy rate is a conservative estimate in Plaintiffs' favor. In total, Fairway Cap's total lost rent during the injunction period amounts to $196,230.00, less $27,909.00 as an adjustment for a 15% vacancy rate, and another $10,170.00 deduction for the rental value of a model unit that Fairway Cap would not have been able to rent (Tr. at 51).

10. **Rents and Rent Incentives** – It is undisputed that Fairway Cap offers renters the first month of rent free as an incentive to encourage new renters to sign a lease. Fairway Cap has argued that only a fraction of the free rent should be deducted from its recovery because the first month's free rent should be amortized over the entire year (DOB at 14–15). Under Fairway Cap's calculation, if the Injunction was in place for three months, and a renter's monthly rent was $1,000 per month (with the first month's rent free), then Fairway Cap would only deduct $250 (or 25%) of $1,000 because the Injunction was only in place for a quarter of the year

7

(DOB at 14). Plaintiffs argue Fairway Cap's damages should be reduced by the full $1,000 to match Fairway Cap's cash flow reality (D.I. 194 at 8).

In support of its argument, Fairway Cap cites JX 15, which is its model rent agreement, where, at Article 34, renters are required to repay their first month's free rent if the lease terminates early for any reason. There is no evidence in the record regarding how frequently early terminations occur or whether Fairway Cap has any past practice of actually enforcing this obligation. To reiterate, it is bedrock Delaware law that our courts cannot "permit a recovery of damages which are merely speculative or conjectural." *Henne v. Balick*, 146 A.2d 394, 396 (Del. 1958). Because Fairway Cap can only speculate that *if* a renter left early, *then* it would successfully have recouped the first month's rent from that renter, it has not proven that anything less than the full amount of the free rent, (i.e., $37,290) should be deducted from its recovery.

11. **Municipal Tax on Rental Receipts** – The parties disagree on whether damages should be reduced by the municipal taxes that would be owed on rental receipts. After carefully reviewing the evidence and considering the arguments of counsel, I see no basis for that reduction. Indeed, to reduce the recovery for taxes owed would be to reduce the recovery by what Fairway Cap has already paid. *See* Tr. at 75, 89 (revealing Fairway Cap has paid the taxes). In other words, Fairway Cap would be taxed twice—once by the municipality, and again by Plaintiffs.

8

12.     **COI Expenses, Property Taxes and License Fees** – During the Injunction period, Fairway Cap obtained COIs for completed units that it was restrained from renting so that, after the Injunction was lifted, it would be able to rent units as quickly as possible (Tr. at 43).  Fairway Cap correctly argues that the expenses associated with applying for and obtaining COIs were a necessary part of its duty to mitigate damages in the event it prevailed at trial (D.I. 196 at 3–4; Tr. at 42).  These expenses were in no way "unnecessary" as Plaintiffs argue, and should not be deducted again (having already been paid) as a means to reduce Fairway Cap's recovery (*Cf.* D.I. 194 at 14).  This rationale also applies to property taxes and rental license fees Fairway Cap payed during the Injunction period.  Considering these line items together, Plaintiffs' argument that Fairway Cap's recovery should be reduced by an additional $32,328.00 is rejected (Chart at 2–5).

13.     **Furnishing the Rental Office** – The parties dispute whether one-time costs incurred for furnishing a rental office at Fairway Village should be factored into the lost profit calculation.  In what amounts to a disagreement over $689.00, Fairway Cap points to testimony from Ms. McDonald (Tr. at 63) to the effect that certain office furniture was used for another location unrelated to leasing in Fairway Village, and then cites JX 3, 4 and 5, which appear to be receipts for office furniture (Chart at 6).  I gather the argument is that because some of this furniture, worth $689, was used on other projects, it should not be deducted from Fairway Cap's recovery

9

because it is not a Fairway Village operating expense. Nothing in the record to which Fairway Cap cites supports this argument because the evidence simply does not explain where the furniture was used and for what purpose. Fairway Cap's recovery will be reduced by $4,116 for the costs of operating its rental office, including the disputed $689.00.

14. **Maintenance and Repair Expenses** – In advance of the evidentiary hearing, Plaintiffs requested that Fairway Cap produce documents relating to "All maintenance and repair costs associated with rental units at Fairway Village." *See* Tr. at 101 (discussing the document request). In response, Fairway Cap produced JX 7, which was labeled "Unit Expenses / Repairs." This document purported to show Fairway Cap's expenses for operating Fairway Village after the Injunction was lifted. Plaintiffs then took these expenses, pro-rated them over the period in which rental units could have been rented during the Injunction and argued Fairway Cap's recovery should be reduced by this amount (D.I. 194 at 12–13). In other words, Plaintiffs argued Fairway Cap's actual expenses after the Injunction are a fair estimate of what its expenses would have been if the units had been rented during the Injunction.

On the evening before the evidentiary hearing, Fairway Cap directed one of its employees to mark certain of these expenses as extraordinary, and then argued during the hearing (and after) that these expenses would not have been incurred

during the Injunction period (Tr. at 103). The problem, of course, is that this assertion was supported by nothing other than Fairway Cap's *ipse dixit*. For example, Ms. McDonald testified that someone died in an apartment which created extraordinary expenses for cleaning the unit (Tr. at 105–06). Nothing in the record, however, explains why this expense—or any other expense for that matter—is extraordinary *vis a vis* other expenses.

As another example, Fairway Cap argues that it incurred extraordinary expenses when it had to repair a unit after a tenant was evicted (D.I. 196 at 21). But, once again, there is no credible evidence in the record supporting this characterization as an extraordinary expense—rather than a work-a-day expense for a residential landlord. As shown in JX 7, Fairway Cap's accounting records do not differentiate between extraordinary expenses, except for Ms. McDonald's handwriting on the eve of Trial. *See, e.g.*, JX 14.

Fairway Cap attempts to excuse its late modifications to JX 7 by suggesting that it did "have any way of knowing that Plaintiffs intended to assert an argument for deducting repair and maintenance expenses" until the eve of the evidentiary hearing (D.I. 196 at 9). Here again, Fairway Cap has it exactly backwards. Fairway Cap—not Plaintiffs—bore the burden of proving its expenses as a component of its proof of lost profits. At the end of the day, I am satisfied that Fairway Cap's

11th hour effort to re-characterize its expenses as extraordinary lacks foundation and amounts to improper speculation.

15.  **Employee Relocation Costs** – Along similar lines, Fairway Cap offered testimony that it had to relocate an employee to Fairway Village so that she could live on the premises in order to show units to interested renters on short notice. Ms. McDonald speculated that if the Injunction had not been in place, she would have hired someone locally who would not have lived in one of the rental units (Tr. at 55).  Here again, the evidence is too speculative to afford it any probative weight.  There is no evidence that a local contractor would have been available to act as rental agent, much less what that contractor would have charged as a commission.  For these reasons, as well as those discussed above, I am satisfied Plaintiffs' calculated reduction ($8,556.00) is appropriate, including the disputed amount of $6,099.00 (Chart at 6–7).

16.  **Rental Office Expenses** – The Parties dispute the expense Fairway Cap pays to operate the Fairway Village rental office.  I gather the total amount in dispute here is $7,559.00 (Chart at 8).  During the evidentiary hearing, Ms. McDonald testified that this office, referred to as the "Bear Trap" office, is used exclusively as an office to support Fairway Village (Tr. at 108).  After reviewing this testimony, and the related evidence, I confess that this disputed line item is hard to follow.  The confusion, in large measure, arises from the fact that Fairway Cap omitted this

expense from its calculations, apparently in the belief that Plaintiffs bore the burden of "establishing any deduction" to its lost rents (DOB at 10). The confusion is further exposed upon comparing pages 23 and 11 of Fairway Cap's Post-Hearing Opening and Reply Briefs, respectively (DOB, D.I. 196). That comparison reveals that the first appearance of the Bear Trap rental office expense was in Fairway Cap's Reply Brief. There, Fairway writes that it "acknowledges the office rent at Bear Trap [was] an expense but [it] disputes Plaintiffs' calculation" (D.I. 196 at 10–11).

This late acknowledgement prevented any meaningful joinder on the full extent of the Bear Trap office operating expenses (whether related to HVAC expenses or office rent) (Chart at 8). To reiterate, Fairway Cap bears the burden of proving its lost profits. This burden *includes* a burden to prove expenses; the Court will not presume that all revenue flows through the business to the bottom line as profits. That is not how businesses work. For this reason, any lack of clarity or completeness in Fairway Cap's calculations is not Plaintiffs' problem. It is a failure of Fairway Cap's *prima facie* proof. Moreover, given that Fairway Cap withheld its rental office expense calculations from its Opening Brief, the arguments relating to those expenses are waived. *Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993) (arguments that could have been raised in opening brief but raised for the first time in reply deemed waived). Fairway Cap's damages will be reduced by $7,728.00 for the estimated cost of operating the Bear Trap office during the Injunction period.

13

17. **The Total Proven Damages** – In total, including those items about which the parties agree, Fairway Cap has proven by a preponderance of the evidence that it is entitled to recover (i) $196,230 for lost rent, (ii) $18,684 for lost utilities expenses, (iii) $10,612 for lost advertising expenses, **less** (iv) $27,909 deducted for estimated vacancy, (v) $10,170 deducted for the model unit that could not be rented out, (vi) $37,290 deducted for first-month rent concessions, (vii) $4,116 deducted for the model unit and office furniture expense, (viii) $9,729 deducted for salary expenses, (ix) $8,556 deducted for monthly furniture and maintenance expenses, (x) $4,416 deducted for advertising expenses and (xi) $10,143 deducted for the expense of the Bear Trap office. The total damages caused by the wrongfully issued Injunction are $113,197.00.

18. **Against Whom Should the Judgment Be Entered** – At the conclusion of the final hearing on the Motion, I asked the parties to address against whom any judgment should be entered. As mentioned, Plaintiffs are all members of an unincorporated association (Concerned Citizens) that has the power to sue and be sued under a common name pursuant to 10 *Del. C.* § 3904. Fairway Cap has indicated it is prepared to negotiate a Stipulation that will confirm the individually-named Plaintiffs in this action will be in the same judgment position as the other members of the Concerned Citizens unincorporated association (D.I. 203). I agree that is the right outcome given the legal status of unincorporated associations under

14

our law.  To that end, the parties should confer and submit a Joint Proposed Order for Entry of Final Judgment regarding the Motion within ten (10) days.

**IT IS SO ORDERED.**

Dated:  August 7, 2020

*/s/ Joseph R. Slights III*
Vice Chancellor
